**AETNA CASUALTY & SURETY CO., Plaintiff,**

v.

**DOW CHEMICAL COMPANY, Defendant.**

**No. 93–73601.**

United States District Court, E.D. Michigan, Southern Division.

Oct. 29, 1998.

---

Charles W. Browning, Detroit, MI.

Michael Foradas, Chicago, IL.

Michael Conway, Chicago, IL.

Joseph A. Hinkhouse, Chicago, IL.

George Curran, Farmington, Hills, IL.

**OPINION AND ORDER GRANTING DOW'S MOTION FOR SUMMARY JUDGMENT BASED UPON THE "OWNED PROPERTY" AND "ALIENATED PREMISES" BAR TO INSURANCE COVERAGE AS IT APPLIES TO FOUR SITES: CASPER/BROOKHURST, DALTON, MIDLAND, CLIFFS–DOW; GRANTING IN PART AND DENYING IN PART DOW'S MOTION FOR SUMMARY JUDGMENT BASED UPON THE "OWNED PROPERTY" AND "ALIENATED PREMISES" BAR TO INSURANCE COVERAGE AS IT APPLIES TO CONALCO; DENYING CENTURY INDEMNITY'S CROSS MOTION AS IT APPLIES TO CLIFFS–DOW; DENYING THE LONDON INSURERS' MOTION FOR SUMMARY JUDGMENT AS IT APPLIES TO THE CONALCO SITE WITH REGARD TO THE OWNED PROPERTY PROVISION; STRIKING FIRST STATE INSURANCE COMPANY'S JOINDER TO CENTURY INDEMNITY'S RESPONSE TO DOW'S MOTION CONCERNING THE OWNED PROPERTY AND ALIENATED PREMISES PROVISION AS IT APPLIES TO CLIFF–DOW; AND DENYING THE JOINDERS OF VARIOUS OTHER INSURERS**

EDMUNDS, District Judge.

This matter came before the Court on Dow's motion for summary judgment based upon the "owned property" and "alienated premises" bar to insurance coverage as it applies to five sites: Casper/Brookhurst, Cliffs–Dow, Conalco, Dalton, and Midland [1];

---

1. Responses to Dow's motion were filed by: Travelers (6/8/98), Century Indemnity, and the London Insurers. Numerous insurers joined in the response briefs as follows:

    1. Joinders to Travelers', Century's, and London's response briefs: Zurich, Highlands Insurance Co., Home, Interstate, and International Insurance Co.;

    2. Joinder to Travelers' response brief: Employers Insurance of Wasau;

    3. Joinder to Century's response brief: American Home Assurance, National Union Fire

Century Indemnity's cross motion as it applies to Cliffs–Dow; and the London Insurers' motion for summary judgment as it applies to the Conalco site.[2] The issue presented here is whether the owned property and alienated premises provisions bar insurance coverage for environmental clean-up costs. As explained below, this Court holds that in order for an insured to escape the owned property provision's bar to coverage in the context of environmental remediation occurring on its own property, the insured must show either (1) governmental demand to perform environmental remediation, or (2) damage or imminent damage to a third-party's property. For the reasons set forth below, Dow's motion is GRANTED and the Insurers' cross motions are DENIED.

## I. Facts

■ The "owned property" provision in the liability insurance policies at issue here excludes coverage for "injury to or destruction, including the loss of use of, property owned" by the insured.[3] An "alienated premises" provision precludes the insured from creating, through conveyance of property, coverage that would be otherwise barred by the owned property provision. *LaSalle Nat'l Trust, N.A. v. Schaffner*, 818 F.Supp. 1161, 1169 (N.D.Ill.1993). The principles that apply to these provisions are the same, *Unigard Mut. Ins. Co. v. McCarty's, Inc.*, 756 F.Supp. 1366, 1369–70 (D.Idaho 1988), and for the purpose of these motions, the two provisions are treated the same.

Dow argues that under Michigan law, the owned property provision does not bar coverage for the costs of environmental clean-up on the following five sites: Casper/Brookhurst, Cliffs–Dow, Conalco, Dalton, and Midland. The London Insurers move for summary judgment contending that the owned property provision bars coverage at the Co-

nalco site. Similarly, Century Indemnity moves for summary judgment claiming that the provision bars coverage at the Cliffs–Dow site.

## II. Standard of Review

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. Analysis

### A. Burden of Proof

■ Because the "owned property" provision is found in the insuring agreement and not in the limits of liability or the exclusionary portion of the policy, the insured bears the burden of proof. *See* Opinion and Order Denying London Insurers' Motion for Sum-

---

Insurance, Insurance Company of North America (AIG-related companies), Continental Casualty Co., Fireman's Fund, First State Insurance Co.; and

4. Joinder to London's response brief: Fireman's Fund and Continental Casualty Co.

**2.** The following insurers joined in London's motion with respect to the Conalco site: Continental Casualty Company, Fireman's Fund Insurance Company, and Peerless Insurance Company.

**3.** Dow points out that the Travelers policies from 1952–1956 do not include the owned property provision.

mary Judgment Regarding the "Expected or Intended" Clause With Respect to the Conalco Site, filed September 2, 1998 (insured has burden of proving it did not expect or intend damage because "expected or intended" language is part of insuring clause, not an exception to coverage).

### B. Applicable Law

▪ Michigan law applies in this case. *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 883 F.Supp. 1101 (E.D.Mich.1995). A federal court deciding a diversity case under state law must apply the law of the state's highest court. If the state's highest court has not decided the applicable law, the federal court must ascertain the state law from "all relevant data." *Bailey v. V. & O Press Co.*, 770 F.2d 601, 604 (6th Cir.1985). A state's intermediate appellate court decision is a "datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *FL Aerospace v. Aetna Casualty & Sur. Co.*, 897 F.2d 214, 218–19 (6th Cir.) (quoting *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940)), *cert. denied*, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990). A federal court may also consider decisions from other jurisdictions. *Bailey*, 770 F.2d at 604.

The Michigan Supreme Court has not addressed the applicability of the owned property provision to environmental remediation. Accordingly, this Court must determine what the Michigan Supreme Court would decide if faced with this issue.

### C. General Rules of Contract Interpretation

▪ The rules of construction for insurance contracts are the same as those for any other written contract. *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir.1993). The question of whether a contract is ambiguous is a question of law for the court. *Steinmetz Elec. Contractors v. Local Union No. 58*, 517 F.Supp. 428, 432 (E.D.Mich.1981); *Mayer v. Auto–Owners Ins. Co.*, 127 Mich.App. 23, 27, 338 N.W.2d 407, 409 (1983). Further, construction of a contract, whether it is ambiguous or unambiguous, is a question of law for the court. *Petovello v. Murray*, 139 Mich.App. 639, 642, 362 N.W.2d 857, 858 (1984); *Fragner v. American Community Mut. Ins. Co.*, 199 Mich.App. 537, 540, 502 N.W.2d 350, 352 (1993).

▪ A contract which admits of but one interpretation is unambiguous. *Fragner*, 199 Mich.App. at 540, 502 N.W.2d at 352. In contrast, a contract provision is ambiguous if it is capable of two or more constructions, both of which are reasonable. *Petovello*, 139 Mich.App. at 642, 362 N.W.2d at 858.

▪ If a contract is clear and unambiguous, the court must enforce the contract as written, according to its plain meaning, *Clevenger v. Allstate Ins. Co.*, 443 Mich. 646, 654, 505 N.W.2d 553, 557 (1993), without looking to extrinsic evidence. *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 205 n. 6, 476 N.W.2d 392, 396 n. 6 (1991). It is improper for the court to ignore the plain meaning of the policy's language in favor of a technical or strained construction. *Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F.Supp. 59, 66 (W.D.Mich.1989). If the contract is ambiguous, the court must determine the intent of the parties. *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.*, 197 Mich. App. 482, 494–95, 496 N.W.2d 373, 379 (1992), *aff'd*, 445 Mich. 558, 519 N.W.2d 864 (1994). The function of the court is to determine and give effect to the parties' intent as discerned from the policy's language, looking at the policy as a whole. *Auto–Owners v. Churchman*, 440 Mich. 560, 566, 489 N.W.2d 431, 434 (1992). Ambiguous terms in an insurance policy are construed in favor of the insured. *Arco Indus. Corp. v. Am. Motorists Ins.*, 448 Mich. 395, 402–03, 531 N.W.2d 168, 172 (1995).

### D. Owned Property Provision As Applied to Environmental Remediation

▪ The Sixth Circuit has interpreted Michigan law and has held that the owned property provision does not preclude insurance coverage for environmental remediation where the insured remediated property owned by a third party or where there was a

government demand for the cleanup. *Anderson Development Co. v. Travelers Indemnity Co.*, 49 F.3d 1128 (6th Cir.1995).[4] In *Anderson,* the insured entered into a consent decree with the EPA to remediate groundwater after chemical discharges from the insured's plant tainted municipal water. The clean-up occurred exclusively on the insured's own property. The Sixth Circuit held that the owned property provision did not bar recovery because under Michigan law the State owns the groundwater, not the insured. Because the insured cleaned up third-party property, the owned property provision simply did not apply. 49 F.3d at 1133–34. *Accord Polkow v. Citizens Ins. Co. of Amer.*, 180 Mich.App. 651, 447 N.W.2d 853 (1989), *rev'd on other grounds* 438 Mich. 174, 476 N.W.2d 382 (1991); *Upjohn Co. v.. New Hampshire Ins. Co.*, 178 Mich.App. 706, 444 N.W.2d 813 (1989), *rev'd on other grounds,* 438 Mich. 197, 476 N.W.2d 392 (1991); *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 590, 336 N.W.2d 838 (1983) ("[P]ercolating water is not owned by the owner of the land under which it flows and so does not fit within the policy's exclusion.") *See also Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 662 F.Supp. 71, 74 (E.D.Mich. 1987) (owned property provision does not preclude insurance coverage for government ordered cleanup because claims included damage to adjoining landowners and to public); *rev'd on other grounds,* 750 F.Supp. 1340 (E.D.Mich.1990). *Compare Boardman Petroleum, Inc. v. Federated Mutual Insurance Company*, 269 Ga. 326, 498 S.E.2d, 492, 495 (Ga.1998) (where groundwater . *is* owned by the property owner, the owned property provision applies to groundwater remediation); *American States Insurance Company v. Hanson Industries,* 873 F.Supp. 17, 24 (S.D.Tex.1995) (same).

Highland Insurance Company argues that under Georgia law where the landholder owns the groundwater, the owned property provision bars coverage for Dow's cleanup of the groundwater. Highlands erroneously presumes that Georgia law applies. As noted above, this Court already ruled that Michigan law applies. *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 883 F.Supp. 1101 (E.D.Mich. 1995). The Court held that in this complex case, interpreting insurance coverage in accordance with the differing laws of a multitude of locations would result in litigation chaos, would cause a tremendous delay, and would waste the resources of the parties and the Court. Under Michigan law, if an insured remediates groundwater contamination, the owned property provision does not bar insurance coverage for the costs of remediation.

■ Where an insured remediates groundwater contamination, this alone is sufficient to avoid the owned property provision. The insured need not also show that the government mandated cleanup. In *Upjohn Co. v. New Hampshire Ins. Co.*, 178 Mich. App. 706, 444 N.W.2d 813 (1989), *rev'd on other grounds,* 438 Mich. 197, 476 N.W.2d 392 (1991), the insured noticed leakage of a sludge storage tank in its Puerto Rico plant and, suspecting groundwater contamination, began to monitor the well of a neighboring company. After detecting contamination, the insured supplied the neighboring company with water, decontaminated the tainted groundwater, and then cleaned its own subsoil to prevent additional contamination from reaching groundwater. Most of the contamination was still in the insured's subsoil, but it "would eventually make its way into the groundwater." *Id.* at 718, 444 N.W.2d 813. The insured took this action without prompting by any government agency.

The court first found that the owned property provision did not bar coverage because the groundwater was owned by the people of Puerto Rico, not by Upjohn. *Upjohn,* 178 Mich.App. at 719, 444 N.W.2d 813. The court went on to hold that government mandate to clean up was not necessary to escape

---

4. The *Anderson* decision is a Sixth Circuit decision that is, of course, precedent that is binding upon this Court. This Court must disregard the Insurers' argument that *Anderson* was wrongly decided and that the Court should follow instead

the contrary decision of the Delaware Supreme Court in *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.,* 686 A.2d 152 (Del.1996) (rejecting *Patz* ).

the owned property provision.[5] Rather, it was sufficient that "governmental agencies *could have* ordered Upjohn to act." *Id.* at 720, 444 N.W.2d 813 (emphasis added). The court explained:

> We note that the improper release of toxic wastes may cause property damage not only to the actual owner of the land, but also to the government because of its independent interest, behind the titles of its citizens, in all the air and earth (i.e., its natural resources) within its domain. *It makes no difference that Upjohn took the remedial action it did before being ordered to do so* and, in fact, we believe that such swift remedial action should be encouraged rather than discouraged.

*Id.* (emphasis added). *Upjohn* held that to escape the owned property provision in the absence of a governmental mandate to remediate, the insured must show damage or imminent damage to the property of a third party.[6]

Imminent damage to groundwater or to other third-party property, without a showing of existing damage, is sufficient to avoid the owned property provision. The Michigan Court of Appeals recently held in *Arco Industries Corp. v. American Motorists Ins. Co.*, 1998 WL 709327, —— Mich.App. ——, —— N.W.2d —— (Mich.App. Oct.9, 1998) that insurance coverage of "on-site soil clean-up is not barred by the 'owned property' exclusion where there is a threat that the contaminants in the insured's soil would migrate to the ground water (sic) or to the property of others." *Id.* at *4, —— N.W.2d at ——.[7] *Accord Savoy Medical Supply Co. v. F & H Manufacturing Corp.*, 776 F.Supp. 703 (E.D.N.Y.1991) (alienated property provision did not bar coverage where there was threat of contamination to third-party property).

Some courts find that coverage for remediation of imminent damage escapes the owned property provision only where actual damage has already occurred. *Intel Corp. v. Hartford Accident & Indemnity Co.*, 952 F.2d 1551, 1565 (9th Cir.1991); *State of New Jersey v. Signo Trading International*, 130 N.J. 51, 64, 612 A.2d 932, 938–39 (N.J.1992). This Court adopts a different approach. The Michigan Supreme Court likely would find the holding of *Arco* persuasive; an insured need not show actual damage to avoid the owned property provision, so long as the insured can establish the need for remediation to prevent imminent harm to a third party. "To require actual damage would cre-

---

**5.** Note that in each of the other relevant Michigan cases and federal cases applying Michigan law, government action is either a partial grounds for decision, *Anderson*, 49 F.3d at 1134, or a background fact. *United States Aviex*, 125 Mich.App. at 583, 336 N.W.2d 838; *Polkow*, 180 Mich.App. at 653, 447 N.W.2d 853; *Fireman's Fund v. Ex–Cell–O*, 662 F.Supp. at 74.

**6.** The *Upjohn* decision should not be read too broadly; it should be limited to the facts of the case. The court is not saying that the owned property provision is inapplicable any time that the government could have ordered remediation. Otherwise, there would be a plethora of remedial measures that would escape the owned property provision. In *Upjohn*, some contamination of third-party property had already occurred and additional contamination was imminent. *Upjohn*, 178 Mich.App. at 718, 444 N.W.2d 813.

**7.** The *Arco* court ruled alternatively that in environmental clean-up cases there is an independent public interest in the state's natural resources that supersedes the "owned property" provision. 1998 WL 709327 at *4, —— N.W.2d at ——. *Arco* followed *Anderson*, 49 F.3d at 1134 ("[The Michigan Court of Appeals] recognized, in environmental contamination clean-up cases, an independent government interest that supersedes any 'owned property' exclusion in the policies"), *Polkow*, 180 Mich.App. at 659–60, 447 N.W.2d 853 ("[The] public interest is enough to defeat an exclusion for damages to the insured's own property"), and *Upjohn*, 178 Mich.App. at 720, 444 N.W.2d 813 ("[T]he improper release of toxic wastes may cause property damage not only to the actual owner of the land, but also to the government because of its independent interest, behind the titles of its citizens, in all the air and earth (i.e., its natural resources) within its domain.") If this language is interpreted broadly, then any time an insured pollutes, even if the insured damages only its own property with no imminent harm to another, the insured will not be barred from obtaining insurance coverage under the owned property provision. This interpretation seems to go too far. It is not that the public interest in the environment actually supersedes or defeats the terms of the insurance policy. Rather, the public interest in the groundwater, which may be protected through government action, is a locus of third-party liability. Third-party liability is precisely what a liability insurance policy was designed to cover, and the owned property provision may not defeat the very purpose of the policy.

ate bad public policy because it would encourage insureds to wait for contamination to migrate before taking action. There is no logical or just reason why an insured should allow a condition on his land to result in damage to others simply to assure and secure coverage when preventative measures could prevent not only substantial damage or loss to the property of others, but also prevent sizable claims for damages against the insured and his insurer." *Consolidated Rail Corp. v. Certain Underwriters at Lloyd's,* 1986 WL 6547, at *5 (E.D.Pa. June 5, 1986) (Dow's Exhibit 10) (citation omitted).

If an insured's subsoil is contaminated and will imminently affect the groundwater, the insured need not wait for the groundwater to show contamination in order to obtain insurance coverage for remediation. The requirement of imminent damage prevents insureds from passing off the cost of property improvements to their insurers where third-party liability is purely speculative. If third-party property damage is not imminent, that is, if the subsoil might contaminate groundwater at some point in the uncertain future, the insurer's liability for clean-up of that subsoil should be barred by the owned property provision.

While the owned property provision does not bar coverage for remediation of third-party property or remediation to prevent imminent damage to third-party property, it also does not bar coverage where remediation was undertaken pursuant to a government mandate. *Anderson,* 49 F.3d at 1134 (relying on *Patz v. St. Paul Fire & Marine Ins. Co.,* 15 F.3d 699 (7th Cir.1994)). The Sixth Circuit in *Anderson* predicted that the Michigan Supreme Court would find the Seventh Circuit's reasoning in *Patz* even more persuasive than the third-party property rationale. 49 F.3d at 1134. *Patz* found that governmental mandate is equivalent to liability to a third party, and, thus liability insurance must provide coverage for remediation done pursuant to such a mandate.

In *Patz,* the Wisconsin Department of Natural Resources discovered groundwater and soil contamination on the premises of · an insured engaged in the painting of farm equipment. The DNR ordered the removal of barrels of paint sludge together with soil surrounding the barrels and soil surrounding a related disposal pit. *Patz,* 15 F.3d at 702. The insurer refused to pay for this cleanup, arguing that the contamination affected only soil and groundwater within the boundaries of the insured's property and coverage was therefore barred by the owned property provision. Finding for the insured, the court emphasized that the cleanup costs were an existing liability to the government, not costs for damage to the insured's property:

> [T]he Patzes are not attempting to obtain an insurance award for a reduction in the value of, or other damage to, their land. How could they? It is a policy of liability insurance, not casualty insurance, on which they have sued. *They seek to recover the cost of complying with a government order to clean up a nuisance.* The fact that the clean up occurred on their land is irrelevant. For all we know, the damage to the land was much less than the cost of cleaning it up.

15 F.3d at 705 (emphasis added).

The *Patz* court also explained that where there is a government mandate, other issues such as the ownership of the groundwater and the imminence of contamination are irrelevant.

> [I]t is irrelevant whether the groundwater beneath the Patzes' property is owned by them or ... by the state, how soon the groundwater contamination would have spread to groundwater beneath neighbors' property if the clean-up had not been ordered, whether but for the clean up the contamination from the barrels of paint sludge would have leached to soil beneath the neighbors' property, or in short how much of a risk to other people's property the contamination created. The Patzes are not seeking to recover for damage to their property; they are seeking to recover the cost of the liability that the Department of Natural Resources imposed on them for maintaining a nuisance.

15 F.3d at 705 (citation omitted).

In short, *Patz* focused on liability to the government. The essence of a comprehensive general liability policy is third-party lia-

bility; governmental mandate imposes third-party liability.[8] It follows, then, that insurance coverage should be provided for liability imposed by the government. After all, the State does not require cleanup of environmental contamination solely to benefit the insured. The State is concerned with the health and welfare of the public at large. *Savoy*, 776 F.Supp. at 709.

■■■ Several courts have criticized the *Patz* approach for failing to apply the allegedly unambiguous language of the policies. These courts assert that the owned property provision is clear—when an insured cleans up his own property, the owned property provision precludes insurance coverage. *See, e.g., Boardman Petroleum*, 498 S.E.2d at 496; *E.I. du Pont de Nemours & Company v. Allstate Ins. Co.*, 686 A.2d 152, 157 (Del. 1996). These courts base their decisions on the faulty premise that the owned property provision is unambiguous. It is this Court's view that the provision is ambiguous. The policy language provides coverage for third-party liability and, at the same time, bars coverage for the costs of "injury to or destruction, including the loss of use of, property owned" by the insured. In the context of environmental cleanup, the insured submits a claim for cleanup on his own property necessitated by liability to another. This internal inconsistency renders the policy ambiguous in the context of environmental remediation.

Because the contract is ambiguous, the court must determine the intent of the parties, looking at the policy as a whole. *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.*, 197 Mich.App. 482, 494–95, 496 N.W.2d 373, 379 (1992), *aff'd*, 445 Mich. 558, 519 N.W.2d 864 (1994); *Auto–Owners v. Churchman*, 440 Mich. 560, 566, 489 N.W.2d 431, 434 (1992). Further, because the owned proper-

ty provision is ambiguous, it must be construed in favor of the insured. *Arco Indus. Corp. v. Am. Motorists Ins.*, 448 Mich. 395, 402–03, 531 N.W.2d 168, 172 (1995).

In sum, construing the policy in favor of the insured and following *Anderson, Upjohn*, and *Arco*, this Court holds that in order to avoid the coverage bar contained in the owned property provision, an insured must show either (1) damage or imminent damage to third-party property, including groundwater or (2) governmental demand to perform environmental remediation.

This holding is supported by considerations of public policy and the purposes of liability insurance. At the heart of the disagreement about the owned property provision in the context of environmental remediation is what economists call a "positive externality." In discharging liability to third parties, including the government, insureds reap the incidental benefits of cleaning up their own property. The classic example is groundwater remediation where an insured must clean the groundwater (which is owned by the State) as well as the soil above the groundwater (which is owned by the insured). In the course of remediating, the main goal of which is to discharge liability to third parties, the insured receives a benefit. Its own property is now free of environmental contaminants and, therefore, more valuable. This benefit is a "positive externality" of the discharge of liability to another.

It is this benefit that insurers decry. Insurers complain that the insured has received a boost in property value, courtesy of a policy which promised merely to provide coverage for liability to others. The insurers argue that the potential for moral hazard is great. Insureds have an incentive to clean up envi-

---

8. Governmental demand is not a sufficient condition to escape the owned property provision in some jurisdictions. *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 269 Ga. 326, 498 S.E.2d 492, 495–96 (Ga.1998) (finding that DNR-ordered mandate is insufficient in absence of "reasonable present threat of harm to third-party property"); *Olds–Olympic, Inc. v. Commercial Union Insurance Company*, 129 Wash.2d 464, 479, 918 P.2d 923, 930 (Wa.1996) (finding that demand letter from the state Department of Ecology did not bar application of the owned proper-

ty provision). These jurisdictions offer no sound rationale for their position. In *Olds–Olympic*, for instance, the court failed to offer a useful basis for its position, stating merely that a third-party property interest must be at stake to escape the owned property provision, and "[w]hile the State undoubtedly has a police power interest in regulating the environment, that interest does not rise to the level of a property interest cognizable under present insurance contracts." *Id.* at 479 n. 18, 918 P.2d at 930 n. 18.

ronmental waste even before any liability is incurred, in order to pass on to insurers their property improvement costs, one of the regular costs of doing business.

This positive externality is unavoidable. The fact that the discharge of third-party liability improves the insured's property makes it no less a discharge of third-party liability. To reiterate, third-party liability is exactly what liability insurance is designed to cover. Steps taken to forestall imminent liability should be covered by insurance, notwithstanding that such steps improve the value of an insured's own property. After all, insureds usually know best which of their activities will cause pollution. Swift remedial action should be encouraged, especially since prevention is often far less costly than remediation. *Upjohn*, 178 Mich.App. at 720, 444 N.W.2d 813. "The interests in a swift cleanup warrant creating incentive for the insured to stop the pollution as soon as possible." *Savoy*, 776 F.Supp. at 708.

While early action is desirable for reasons of public policy, the law cannot put the decision of when to perform environmental cleanup solely in the hands of the insureds, who bear all of the decision's potential benefits and none of its costs. The analysis adopted by the Court here safeguards against this moral hazard by requiring evidence of third-party liability to bar the owned property provision—evidence of governmental demand, damage to third-party property, or imminent damage to third-party property.

The Insurers argue that all voluntary remediation is barred by the owned property provision. They rely on broad language in *Patz* and *Anderson*. The *Patz* court wrote, "[Insurer] does argue that its policy stops short of reimbursing an insured for *voluntarily undertaking to reduce potential liability*, and we agree. The owner of an automobile cannot charge the expense of a fancy new braking system to his liability insurer on the ground that the system will make it less likely that he will injure someone in an accident." *Patz*, 15 F.3d at 705 (emphasis added). The *Anderson* court echoed: "the mere desire of an insured to *voluntarily* reduce potential liability could very well be barred by the owned property exclusion."

*Anderson*, 49 F.3d at 1134 (emphasis in original). The application of the voluntary cleanup argument is directly contrary to Michigan law. Under *Upjohn*, the owned property provision does not bar coverage of costs to remediate third-party property even when the remediation was done voluntarily without government mandate. *Upjohn*, 178 Mich. App. at 720, 444 N.W.2d 813.

In addition, this argument takes the *Anderson* and *Patz* courts' discussion of voluntary remediation out of context, and places undue emphasis on the word "voluntary." The word "voluntarily" must be read in context. *Anderson* and *Patz* used the phrase "voluntarily reduce potential liability." The use of the phrase "potential liability" suggests that the courts had in mind not damage or imminent damage to third-party property, but something more remote and uncertain. The automobile example suggests that remediation costs that come within the owned property provision are more remote and uncertain.

The London Insurers also argue that insurance coverage is not provided for ordinary foreseeable business expenses. In making this argument, the Insurers rely on *American Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 550 N.W.2d 475 (1996), where the court distinguished between defense costs which are covered by liability insurance and business expenses which are not. "For example, the costs [the insured] incurred in hooking up to the city sewer system, dredging the sludge from the lagoon, and filling the lagoon in, are likely costs of doing business rather than defense costs. Hooking up to the sewer system, and dredging and filling the seepage lagoons accomplished concrete improvements to the plaintiff's Ionia site and were likely to take place at some point even without the EPA claim." 452 Mich. at 462, 550 N.W.2d at 486.

The business expense argument is simply the "owned property" provision dressed in different clothing. It is just another way of saying that when the insured improves his own property, he should not be entitled to reimbursement under his liability insurance policy. The fact that the discharge of third-party liability improves the insured's proper-

ty makes it no less a discharge of third-party liability. The "positive externality" is unavoidable. Because third-party liability is what the insurance policy is meant to cover, the insurance policy must cover remediation done pursuant to government demand or to abate harm or imminent to third-party property.

The London Insurers and Highland Insurance Company also contend that Dow's motion for summary judgment regarding the owned and alienated property provisions is premature because the parties' experts must first determine how much of the claimed costs relate to owned property and how much of the costs relate to third-party property. The fact that some costs may not have been environmental cleanup costs is irrelevant to the issue presented here—whether the owned property provision bars coverage for those costs that were environmental cleanup costs incurred because of a government demand, because of remediation of damage to third-party property (including groundwater), or because of remediation preventing imminent damage to third-party property.

### E. Application As to Specific Sites

Dow requests a summary judgment ruling that the owned property provision does not bar insurance coverage at the following five sites: Casper/Brookhurst, Midland, Dalton, Cliffs–Dow, and Conalco.

### 1. Casper/Brookhurst

The Casper/Brookhurst site was remediated pursuant to a government demand. In June of 1987, the Environmental Protection Agency issued a PRP letter to Dow ordering remediation. Dow's Exhibit 12. Further, remediation at Casper/Brookhurst included remediation of groundwater, third-party property under Michigan law. Dow's Exhibit 11. Because the cleanup was mandated by the government and because Dow cleaned up third-party property, the owned property provision does not bar coverage for environmental cleanup costs at this site.

### 2. Midland

At the Midland site, Dow remediated damage to the groundwater and other third-party property. An investigation in 1989 and another in 1991, revealed groundwater contamination. Residential wells tested positive for contamination. Dow's Exhibits 45 & 46. Area residents sued Dow for property damage and bodily injury due to the groundwater contamination. This suit is known as the "*White* litigation." Dow's Exhibit 47. Because Dow remediated groundwater at Midland, the owned property provision does not bar coverage for environmental cleanup costs at this site.

### 3. Dalton

Like the Casper/Brookhurst site, Dow remediated groundwater contamination pursuant to governmental demand at the Dalton site. The Georgia Environmental Protection Division found contamination downstream from Dow's facility and demanded that Dow investigate. Dow's Exhibit 36–38. The State of Georgia imposed a Corrective Action Order in 1988, and a Consent Order in 1994. Dow's Exhibit 39 & 43. The Dalton site also involves the *Daffron & Pinion* lawsuit, which alleged that Dow had caused damage to third-party property adjoining the Dalton plant. Because Dow remediated groundwater at Dalton due to a government demand, the owned property provision does not bar coverage for environmental cleanup costs at this site.

### 4. Cliffs–Dow

Like the Casper/Brookhurst and Dalton sites, there was groundwater contamination at the Cliffs–Dow site. In 1991, the State of Michigan issued a PRP letter to Dow, indicating that groundwater contamination had been documented. Dow's Exhibit 21. In addition, the insurers' expert, Dr. McClure, testified that there was groundwater contamination at the Cliffs–Dow site. Century's Exhibit 13, pp. 13–14.[9]

9. There was also a private lawsuit filed, the *Presque Isle* suit. This suit was filed by the subsequent owner of the property. It alleged, among other things, that Dow had damaged the groundwater at the site. Dow's Exhibit 22. The suit was settled on October 10, 1995.

■ Century contends that the owned property provision bars coverage because "even if there is damage to the groundwater on or near the Cliffs–Dow property, Dow has not incurred any cleanup costs as a result of impacted groundwater at the site." Century cites no support for this proposition. Century also argues, "Dow's own consultant stated that the groundwater poses no significant threat to the public, should not be remediated and can be addressed by natural attenuation processes." Century's Exhibit A, Tab 14 at pp. 13–16.[10] Dow escapes the owned property bar to coverage merely by showing there was groundwater contamination at the site. It is not necessary to examine whether the groundwater contamination was a "significant" threat to the public, nor is it necessary to determine, at this juncture, Dow's remediation costs at the site.[11]

The parties also dispute whether cleanup at Cliffs–Dow was done pursuant to a government demand. Century contends that in 1984 Dow voluntarily agreed to investigate possible contamination at Cliffs–Dow and that it voluntarily entered into a cost sharing agreement at the site. It was not until October 31, 1991 that the State of Michigan issued a PRP letter to Dow. Dow's Exhibit 21. This Court found in its June 8, 1998 Opinion and Order that Dow breached the voluntary payments provision at the Cliffs–Dow site by entering into the 1984 cost-sharing agreement, investigating the site in 1985, and undertaking additional remedial measures in 1989. Even presuming that Century is correct that there was no government demand to remediate at Cliffs–Dow, the owned property provision does not bar insurance coverage at the site because there was groundwater contamination. Again, groundwater is third-party property. The owned property provision does not bar insurance coverage of the cost to remediate third-party property.

### 5. Conalco

Dow owned and operated an aluminum processing and magnesium extrusion plant in Madison, Illinois from 1952 to 1969. In 1956, Dow began producing thorium alloys at the plant. A by-product of the product was radioactive thorium [12] sludge. Dow fenced off a forty acre parcel adjoining the plant for the disposal of the thorium. This parcel is known as the "Conalco site." Dow obtained a license for the storage of the thorium at Conalco. The thorium storage was regulated by the Illinois Department of Nuclear Safety.

In 1973, Dow sold the plant and transferred its thorium disposal license to Conalco. Conalco operated the plant until 1986 when it sold the plant to Spectrulite Consortium, Inc. Spectrulite purchased the plant, but did not purchase the 40 acre thorium disposal site. Conalco retained ownership of the disposal site. Around the time Conalco sold the plant to Spectrulite, Conalco decided to cease its operations on the site. Because it was terminating its operations, Conalco had to close the thorium disposal site under the terms of its license.

Conalco contacted Dow, requesting that Dow share in the cost of removing the thorium because Dow was responsible for a great deal of the material. On March 8, 1988, Dow and Conalco entered into a Settlement Agreement whereby they agreed to split equally the remediation costs. The remediation program consisted of the removal of the thorium plus soil that was contaminated by the thorium to the Envirocare Landfill in Clive, Utah. The remediation was completed in 1992 at a cost to Dow of approximately $17.2 million.

---

**10.** This is a mischaracterization of the consultant's report. The report states, "There is evidence that plumes are naturally attenuated on the site," *id.* at p. 16, and "chemical compounds that were identified in groundwater at the previously monitored locations will likely degrade...." *Id.* at p. 23.

**11.** Zurich General Accident and Liability Company, Ltd. argues that Dow seeks an improper advisory opinion to the extent that it seeks a ruling from the Court that the owned property provision does not apply to hypothetical groundwater remediation costs Dow might incur in the future. Zurich misconstrues Dow's motion. Dow merely requests that the Court construe the insurance contracts as a matter of law. The interpretation of contracts is a matter well within the power and jurisdiction of the Court.

**12.** Thorium is also naturally occurring. It is a metallic element that is radioactive, with a half-life of fourteen billion years.

In addition to the on-site soil remediation, some radioactive materials were found in a residential garden owned by a third-party. Dow's Exhibit 27, Olson Dep. p. 74; Dow's Exhibit 28, Wilson Dep. p. 123; Exhibit 17 to Dow's Conalco brief, Schretter Dep. pp. 82 & 85.[13] The record does not indicate the cost of the remediation of the third-party property.

Dow also expended over $218,000 for the removal of approximately 1,000 yards of PCB-contaminated soil at the Conalco site. There was a threat of PCB contamination of the groundwater. Dow Exhibit 27, Olson Dep. pp. 50 & 98.

■ At the Conalco site, there was never a PRP letter issued by a government entity nor was there any other type of clear government demand for cleanup.[14] The Insurers contend that Conalco, on behalf of itself and Dow, voluntarily decided to close the site and, thus, voluntarily subjected itself and Dow to the IDNS requirement that the thorium be removed. Dow argues that the IDNS in essence mandated the removal of the thorium. Further, the thorium was removed under government oversight. The Court finds that such oversight does not amount to a government demand for remediation which would bar the application of the owned property provision.

■ Further, in contrast to the other sites at issue here, the groundwater at Conalco never became contaminated. Even so, there was imminent damage to the groundwater from the PCB contamination, and there was some damage to third-party property from the thorium. Thus, the owned property provision does not bar insurance coverage for remediation costs at the Conalco site for the PCB remediation or for the removal of the thorium from the third-party property.

■ However, there is a fact question whether there was a threat of imminent damage to third-property from the thorium which was located on the Conalco site. On one hand, there appears to have been a threat of imminent damage to third parties and third-party property. When Conalco closed the site, the initial plan was to entomb the thorium on the site. The IDNS rejected this plan due to the site's location in a flood plain, across the street from an elementary school, near a residential neighborhood, and near the Mississippi River and instead required that the thorium be removed. Dow's Exhibit 28, Wilson Dep. pp. 161, 165; Dow's Exhibit 27, Olson Dep. p. 29. A flood could transport the radioactive thorium to the school grounds, the residential areas, and beyond. There was a danger to individuals, especially children, from exposure to the thorium whenever they came onto the property. On the other hand, this threat of damage to third parties and third-party property could be deemed speculative and not imminent. The London Insurers argue that the thorium was insoluble and could not migrate, and further that, when removing the thorium, Dow only had to remove two to twelve inches of top soil. Dow contends that in places it had to remove up to twenty-five feet of soil. The Insurers counter that Dow only had to dig more deeply where it had buried thorium or where animals had burrowed into the ground. Further, Silverstein testified that the thorium pile was benign unless it was stirred with shovels or the like. "The nature of the pile was such that we did not anticipate any airborne material unless people came in and stirred it up with shovels or front loaders or something along that line. Unless acted upon, the pile was benign." Silverstein Dep p. 131.

In sum, there is a fact question whether the thorium located on the Conalco site was remediated to prevent imminent harm to third parties and third-party property. If the finder of fact determines that the remediation of the on-site thorium prevented such imminent harm, then the owned property provision will not bar insurance coverage. If the fact finder determines that there was no such imminent harm to third parties or to

---

**13.** It is not clear how the thorium migrated to the third-party property. There is testimony that possibly the wind blew it there. Exhibit 17 to Dow's Conalco brief, Schretter Dep. pp. 82 & 85.

**14.** Nor was there a third-party law suit at the Conalco site.

third-party property, then the owned property provision will bar coverage of the cost of remediating the on-site thorium.

## IV. Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

Dow's motion for summary judgment based upon the "owned property" and "alienated premises" bar to insurance coverage as it applies to four sites: Casper/Brookhurst, Dalton, Midland, Cliffs–Dow is GRANTED.

Dow's motion for summary judgment based upon the "owned property" and "alienated premises" bar to insurance coverage as it applies to Conalco is GRANTED IN PART AND DENIED IN PART.

Century Indemnity's cross motion as it applies to Cliffs–Dow is DENIED.

The London Insurers' motion for summary judgment as it applies to the Conalco site with regard to the owned property provision is DENIED.

First State Insurance Company's joinder to Century Indemnity's response to Dow's motion concerning the owned property and alienated premises provision as it applies to Cliff–Dow is STRICKEN. First State already obtained summary judgment as to all of the sites at issue in the motions presented here pursuant to the Court's April 10, 1998 Opinion and Order.

The joinders of the following insurers are also DENIED:

1. Joinder to Travelers', Century's, and London's response briefs: Zurich, Highlands Insurance Co., Home, Interstate, and International Insurance Co.;

2. Joinder to Travelers' response brief: Employers Insurance of Wasau;

3. Joinder to Century's response brief: American Home Assurance, National Union Fire Insurance, Insurance Company of North America (AIG-related companies), Continental Casualty Co., Fireman's Fund; and

4. Joinder to London's response brief: Fireman's Fund and Continental Casualty Co.

5. Joinder to London's motion with respect to the Conalco site: Continental Casualty Company, Fireman's Fund Insurance Company, and Peerless Insurance Company.