# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 28, 2022

Lyle W. Cayce
Clerk

No. 21-60794

Hudson Specialty Insurance Company,

*Plaintiff—Appellee*,

*versus*

Talex Enterprises, L.L.C.,

*Defendant—Appellant*,

*versus*

City of McComb,

*Appellant*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 5:17-CV-137

Before Graves, Willett, and Engelhardt, *Circuit Judges*.
Per Curiam:*

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 21-60794

This insurance dispute concerns the partial collapse of the Jubilee Performing Arts Center ("JPAC") building in McComb, MS (the "City"). Defendant Talex Enterprises ("Talex") owned the building and insured it through policies with Plaintiff Hudson Specialty Insurance Company ("Hudson"). After the collapse, the City paid for services to limit the danger the building posed to citizens and nearby properties. Talex assigned its rights under its general liability policy to the City so it could recoup these expenses. In a declaratory judgment action brought by Hudson against Talex and the City ("Defendants"), the district court granted in part Hudson's motion for partial summary judgment finding that the policy excluded most of the City's claimed expenses. Pursuant to 28 U.S.C. § 1292(b), the court certified the following question as an immediately appealable issue: "Whether or not the general liability policies issued by Hudson provide coverage for costs and damages incurred by [the City] as a result of the collapse of the JPAC building."[1] We granted Defendants' petition for an interlocutory appeal. We now AFFIRM in part, REVERSE in part, and REMAND.

## I. Facts & Procedural History

On July 23, 2017, the JPAC building collapsed. The building was insured under two Hudson policies—one issued to Talex, the building's owner, and the other issued to Talex's principal, Terrance Alexander. The policies included building property, personal property, and general liability coverage, but this appeal concerns only the general liability coverage. After the building collapsed, the City paid for services to prevent injury to citizens

---

[1] It also characterized it as "whether the property damage exclusion of the general liability policies applies to exclude coverage for [the City's] claimed expenses with the exception of those for repairs/restoration to property and equipment separate from the building at issue."

No. 21-60794

or damage to nearby properties. In total, the City spent $369,320.39[2] for the following services:

1) $4,234.35 to Neel-Schaffer Engineering for an engineering consultation immediately after the collapse.
2) $25,251.05 to Laird & Smithers for project management of the stabilization and partial demolition of the building.
3) $286,353.00 to Eagle Construction:
   a. $186,863.00 for emergency partial demolition, disposal, and cleaning.
   b. $29,700.00 for removal and disposal of asbestos-containing roofing material and air monitoring.
   c. $69,790.00 for stabilization of the walls, emergency partial demolition, and disposal of debris.
4) $9,566.70 to the City's Public Works Department.
5) $557.72 to the City's Fire Department for keeping people out and protecting the integrity of the site.
6) $32,922.57 to the City's Police Department for keeping people out and protecting the integrity of the site.
7) $4,063.00 to the City Attorney for attorney's fees.
8) $2,222.00 to Little Dixie Yard Works for repairing a city flower bed that was damaged.
9) $4,150.00 to Austin Electric for replacing a city streetlight that was damaged.

---

[2] Defendants claim the City spent $389,320.39 for these efforts, but only $369,320.39 in expenses appear in the record.

Talex's general liability policy with Hudson allows for the recovery of some expenses due to property damage. But there is an exclusion ("owned-property exclusion") for damage to:

> Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property.

In this clause, "you" refers to Talex, the named insured of the policy. Talex agreed to assign its rights under its general liability policy to the City so it could attempt to recoup the above-listed expenses. In its motion for partial summary judgment, Hudson argued that the owned-property exclusion negated coverage for all of the City's claimed expenses. The district court found that most of the City's expenses fell under the owned-property exclusion. It concluded that the only expenses not falling under this exclusion were the $6,372 in repairs for the flower bed and streetlight since those "did not result from damage to the property 'owned, rented, or occupied' by Alexander or Talex."

## II. Standard of Review

We review a district court's grant of summary judgment *de novo*. *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014). We also review *de novo* the interpretation of a contract, including any questions about whether the contract is ambiguous. *Id.* at 511–12. The parties agree that Mississippi law applies to this action. *See EMJ Corp. v. Hudson Specialty Ins. Co.*, 833 F.3d 544, 547 (5th Cir. 2016) ("The arguments are assessed under Mississippi law because the parties agree it governs this case."). We have previously recited these general principles of Mississippi insurance law:

No. 21-60794

> The initial question of whether the contract is ambiguous is a matter of law . . . Mississippi courts give effect to the plain meaning of an insurance policy's clear and unambiguous language . . . No rule of construction requires or permits [Mississippi courts] to make a contract differing from that made by the parties themselves, or to enlarge an insurance company's obligations where the provisions of its policy are clear.

*Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 429 (5th Cir. 2007) (citations and quotations omitted). However, if we determine that ambiguity inheres in the policy language, we must "construe ambiguous terms in favor of the policyholder." *Id.* (citing *J&W Foods Corp. v. State Farm Mut. Auto. Ins. Co.*, 723 So.2d 550, 552 (Miss. 1998)). There is ambiguity "when a term or provision is susceptible to more than one reasonable meaning." *Id.* (citation omitted).

## III. Discussion

Defendants argue the City's claimed expenses do not fall under the owned-property exclusion for two reasons. First, they argue the exclusion does not apply when the purpose of the expenses is to limit third-party liability. Second, they claim none of the expenses qualify as "repair, replacement, enhancement, restoration or maintenance" of the property.

### A.

Defendants argue the owned-property exclusion should not apply because these expenses were incurred to limit liability to third parties. In support, they urge us to apply the holdings of *Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699 (7th Cir. 1994), *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049 (Ind. 2001), and *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 28 F. Supp. 2d 448 (E.D. Mich. 1998). In *Patz* and *Aetna*, courts decided that owned-property exclusions did not apply to remediation expenses incurred

to comply with government orders or prevent imminent harm to third parties. *See Patz*, 15 F.3d at 705 (involuntary clean-up costs incurred due to government order are recoverable and not excluded by owned-property exclusion); *Aetna*, 28 F. Supp. 2d at 455 (owned-property provision does not bar coverage for remediation of third-party property, remediation to prevent imminent damage to third-party property, or government-mandated remediation). In *Dana Corp.*, the Indiana Supreme Court determined that an owned-property exclusion was ambiguous, so it construed it against the insurer and found it did not exclude the company's government ordered clean-up costs. 759 N.E.2d at 1056. But these cases are inapplicable because they involved owned-property exclusions that are less broad than the one at issue here. *See Patz*, 15 F.3d at 705 ("the policy excludes coverage for property damage to property owned by the insured"); *Aetna*, 28 F. Supp. 2d at 451 (policy excluded "coverage for 'injury to or destruction, including the loss of use of, property owned' by the insured"); *Dana Corp.*, 759 N.E.2d at 1055 ("This policy shall not apply: ... to injury to or destruction of or loss of: (1) property owned by any INSURED.").

By contrast, this policy excludes "repair, replacement, enhancement, restoration or maintenance" of the insured's property "*for any reason*, including prevention of injury to a person or damage to another's property." (emphasis added). We faced a nearly identical owned-property exclusion in *Pioneer Exploration*. 767 F.3d at 509. (policy excluded "costs or expenses incurred by you…for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property."). That case involved Louisiana insurance law, and we noted one decision from the Louisiana Court of Appeals, First Circuit finding an owned-property exclusion "did not preclude coverage for remediation costs where those remediation costs had been incurred to prevent imminent or immediate harm to third-parties." *Id.*

at 517 (citing *Norfolk S. Corp. v. California Union Ins. Co.*, 2002-0369 (La. App. 1 Cir. 9/12/03), 859 So. 2d 167, 194-95). Importantly, that Louisiana court "did not reproduce in its opinion the language of the 'owned' property exclusion at issue." *Id.* In any case, we agreed with the district court that the oil company's containment costs after a well blow-out to prevent potential third-party liability fell under the clear language of the owned-property exclusion. *Id.* at 518.

In *Taos Ski Valley, Inc. v. Nova Cas. Co.*, the Tenth Circuit analyzed an owned-property exclusion identical to the one here. 705 F. App'x 749, 753 (10th Cir. 2017) ("[p]roperty you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for ... restoration ... of such property *for any reason, including prevention of ... damage to another's property.*") (emphasis added by court). In that case, Taos Ski Valley ("TSV") spent over a million dollars to abate contamination to and protect nearby water sources after learning of soil contamination. *Id.* at 750. Relying on the same cases Defendants urge us to apply here, TSV argued the owned-property exclusion was inapplicable to its remediation efforts since they were undertaken to limit liability to state and federal environmental authorities. *Id.* at 754. The Tenth Circuit rejected this argument since the addition of "for any reason, including prevention of… damage to another's property" plainly narrowed coverage:

> To be covered, the liability cannot be for damage to property that the insured party owns, rents, or occupies. Thus, the Exclusion defeats coverage for TSV's remediation costs incurred because of soil contamination on the resort's land, no matter that the reason for the costs was third-party liability.

*Id.* at 753.

We reach the same conclusion under Mississippi law: the clause unambiguously excludes expenses for the "repair, replacement,

enhancement, restoration or maintenance" of Talex's property for any purpose, including mitigating potential harm to the public or adjacent buildings and limiting liability to third parties.

### B.

Now that we have determined that the underlying purpose of the expenses does not affect the applicability of the exclusion, the remaining question is whether the City's expenses qualify as "repair, replacement, enhancement, restoration or maintenance of such property." Under Mississippi law, we give effect to the plain meaning of unambiguous terms. *Leonard*, 499 F.3d at 429. Since the policy does not define the terms listed in the owned-property exclusion, we look for plain meaning in dictionary definitions from the time the parties agreed to the policy in 2017. *See Reynolds v. Allied Emergency Servs., PC*, 193 So. 3d 625, 633 (Miss. 2016) (relying on Webster's Dictionary and Black's Law Dictionary for the plain meaning of "Appeal"); *Motor Vehicle Cas. Co. v. Atlantic Nat'l Ins. Co.*, 374 F.2d 601, 605 (5th Cir. 1967) (the meaning and application of plain words are to be judged in the light of the situation of the parties at the time they made the agreement). Accordingly, we recite the following relevant dictionary definitions:

### *Maintenance*

- "The action of keeping something in working order, in repair, etc.; the keeping up of a building, institution, body of troops, etc., by providing means for equipment, etc.; the state or fact of being so kept up; means or provision for upkeep." *Maintenance*, THE OXFORD ENGLISH DICTIONARY (online ed. 2022).[3]

---

[3] "The action of keeping in effective condition, in working order, in repair, etc.; the keeping up of (a building, light, institution, body of troops, etc.) by the supply of funds

No. 21-60794

- "The action of upholding or keeping in being a cause, right, state of things, government, etc." *Maintenance*, The Oxford English Dictionary (online ed. 2022).[4]

- "The care and work put into property to keep it operating and productive; general repair and upkeep." *Maintenance*, Black's Law Dictionary (10th ed. 2014).

*Repair*

- "An act of restoring an object or structure to good condition by replacing or fixing parts, or of replacing or fixing parts in order to maintain it in good condition." *Repair*, The Oxford English Dictionary (online ed. 2022).[5]

- "The process of restoring something that has been subjected to decay, waste, injury, or partial destruction, dilapidation, etc.; an instance or a result of this process <the repair of a building> <hardly noticeable repairs>." *Repair*, Black's Law Dictionary (10th ed. 2014).

---

or needful provision; state or fact of being so kept up; means or provision for keeping up." *Maintenance*, The Oxford English Dictionary (2d ed. 1989). The Oxford English Dictionary ("OED") online edition includes entries from the Third Edition (2000) but is also updated every three months with "further revisions to definitions, pronunciation, etymology, headwords or variant spellings, quotations, dating or styling of citations." Each OED online entry is accompanied by its analogous entry in the Second Edition (1989) to underline the definition's consistency during the relevant time frame.

[4] "The action of upholding or keeping in being (a cause, right, state of things, government, etc.)." *Maintenance*, The Oxford English Dictionary (2d ed. 1989).

[5] "The act of restoring to a sound or unimpaired condition; the process by which this is accomplished; the result attained." *Repair*, The Oxford English Dictionary (2d ed. 1989).

No. 21-60794

*Restoration*

- "The action of restoring a thing to a former state or position; the fact of being restored or reinstated." *Restoration*, The Oxford English Dictionary (online ed. 2022).[6]

With these definitions in mind, we now turn to each of the City's expenses.

### i. Stabilization and Demolition Expenses

After the collapse, the City paid Eagle Construction to stabilize the walls of and demolish portions of the JPAC building. Eagle's stabilization efforts fall under the plain meaning of repair because they fixed the walls in order to restore the building to a good condition. The need for these efforts only arose because the building was subjected to partial destruction—the collapse. Granted, the stabilization efforts did not return the building to its original condition, but their purpose was to restore the building to a better condition so it would not do more damage to neighboring properties. The Eighth Circuit reached the same conclusion in *Clarinet, LLC v. Essex Ins. Co.*, 712 F.3d 1246 (8th Cir. 2013). That case involved an insurance dispute over a building that was seriously damaged by a storm. *Id.* at 1248. The building remained structurally unsound after both emergency and ongoing efforts to stabilize the building, so it was demolished. *Id.* The building owner sought coverage of both the stabilization and demolition costs under its general liability policy, but the Eighth Circuit found that an owned-property exclusion identical to the one at issue here "patently excludes such repairs, even when undertaken to prevent harm to third parties or property." *Id.* at 1250. Likewise, we find that wall stabilizations qualify as repairs.

---

[6] "The action of restoring to a former state or position; the fact of being restored or reinstated." *Restoration*, The Oxford English Dictionary (2d ed. 1989).

The Eighth Circuit also found that demolition qualified as repair, but we conclude that demolition falls under the plain meaning of maintenance. Defendants argue that partial demolition "cannot be construed as efforts to repair, replace, enhance, restore or maintain the insured building." But this argument narrows the exclusion—it applies not just to the *building* but to the *property*. Demolition or partial demolition does not keep the *building* in working order. But according to the City, the controlled demolition of portions of the JPAC building was to preserve surrounding property and public safety. Thus, the demolition qualifies as maintenance because it was required to keep the *property* operating or in working order—without the demolition efforts, the property would continue to pose a threat to people and nearby buildings.

### ii. Clean-Up Expenses

The City also paid Eagle to clean and dispose of debris and roofing material from the collapse site. In *Taos Ski Valley*, the Tenth Circuit concluded that "'restoration' accurately describes the process TSV initiated to clean up its soil contamination and to prevent its spread." 705 F. App'x at 755. In reaching this conclusion, it relied on the OED definition of restoration: "The action of restoring a thing to a former state or position; the fact of being restored or reinstated." *Id.* (citing The Oxford English Dictionary (3d ed. 2010)). It also relied on a Wisconsin Court of Appeals case involving a fire at a tire recycling plant that left the property "contaminated with debris and pools of fire suppression water." *Watertown Tire Recyclers, LLC v. Nortman*, 788 N.W.2d 384, 2010 WL 2403094, at *1 (Wis. Ct. App. 2010) (unpublished table decision). In that case, the EPA and Wisconsin's Department of Natural Resources ordered the removal of the on-site debris and water to address risks posed to public groundwater in a nearby river. *Id.* After performing this clean-up, the plant sought to recover these expenses under its general liability policy, but it was faced with an

owned-property exclusion identical to the one at issue here. *Id.* at \*2. That court stated, "[g]iving the term 'restoration' its ordinary meaning, it is apparent that returning contaminated property to something much closer to its former non-contaminated state is 'restoration'," so it held that restoration encompassed the plant's clean-up activities. *Id.* at \*3.

Both clean-up efforts here qualify as restoration based on the definition listed above and the reasoning in *Watertown* and *Taos Ski Valley*. By clearing and removing debris from the site, the City was returning the property to a former state. By removing and disposing of asbestos-infested roofing materials and monitoring the air, the City was returning the property to something closer to a non-contaminated state.

### iii. Engineering Consultation Fees

The City paid Neel-Schaffer for an engineering consultation after the collapse and Laird & Smithers for project management of the partial demolitions and stabilization. Since the projects themselves qualify as repair, maintenance, or restoration, the consulting expenses for those projects fall under the same terms as the projects.

### iv. Police and Fire Expenses

The City paid for the around-the-clock presence of its fire and police personnel to protect the integrity of the site and keep people out. On the one hand, it is reasonable to read this police and fire department presence as maintenance. By keeping watch over the site and keeping people out, these public safety officials were "upholding or keeping in being" the property in its current state. This aligns with one of the definitions of maintenance listed above. On the other hand, the definitions of maintenance as "[t]he action of keeping something in working order" or "[t]he care and work put into property" both imply that actions are taken *upon* the property to keep it in working order. Keeping watch is an action, but it is not performed upon the

property and does not involve putting work into the property. Thus, there are at least two reasonable meanings for the term maintenance—one where these expenses would fall under the exclusion and one where they would not. With this ambiguity, we read the owned-property exclusion against Hudson and find that it does not exclude these expenses. *See J&W Foods Corp.*, 723 So.2d at 552.

### v. Public Works Expenses

The City paid $9,566.70 to its Public Works Department, but there is no record evidence explaining what role these employees performed. On remand, the district court should determine their role and decide whether it falls within the exclusion consistent with this opinion.

### vi. Attorney's Fees

There is also no record evidence explaining the purpose of the $4,063.00 in attorney's fees. If like the engineering consultations, this consultation was directed toward repair, maintenance, or restoration efforts, then the fees would fall under the exclusion. But these attorney's fees would not fall under the exclusion if this consultation was regarding issues that would not themselves fall under the exclusion. On remand, the district court should determine the basis for these fees and decide whether they fall within the exclusion consistent with this opinion.

### vii. Flower Bed and Streetlight Repairs

Finally, the district court correctly found that the repairs to the flower bed and streetlight do not fall under the owned-property exclusion because both were on property not owned, rented, or occupied by Talex.

### IV. Conclusion

For the reasons discussed above, the district court correctly found that the partial demolition, stabilization, clean-up, and engineering fees fall

under the owned-property exclusion. It also correctly found that the flower bed and streetlight expenses do not fall under the exclusion. We reverse the district court's finding that the fire and police department expenses fall under the exclusion. Finally, we remand with respect to the public works department expenses and attorney's fees.

AFFIRMED in part; REVERSED in part; and REMANDED.