**U S WEST COMMUNICATIONS, INC.,
a Colorado corporation, Plaintiff,**

v.

**PUBLIC SERVICE COMMISSION OF UTAH; Stephen F. Mecham, Constance B. White, Clark D. Jones, Commissioners of the Public Service Commission of Utah; and Western Wireless Corporation, a Washington corporation, Defendants.**

**No. 2:97 CV 558.**

United States District Court,
D. Utah,
Central Division.

Nov. 23, 1999.

David J. Jordan, Gregory B. Monson, Stoel Rives LLP, Salt Lake City, for U S West Communications, Inc., a Colorado corporation, plaintiffs.

Sandy J. Mooy, Public Service Commission, Michael L. Ginsberg, Utah Attorney General's Office, Salt Lake City, UT, for Stephen F. Mecham, Constance White, Clark Jones, Public Service Commission UT, Defendants.

Alan L Sullivan, Mr., Bradley R. Cahoon, Snell & Wilmer LLP, Salt Lake City, Joseph A. Boyle, Kelley Drye & Warren, Parsippany, NJ, Douglas P. Lobel, Charles M. Oliver, Kelley Drye & Warren, Washington, DC, for Western Wireless.

## ORDER

KIMBALL, District Judge.

Before the Court are the cross motions for summary judgment of Plaintiff U.S. West Communications, Inc. ("US West") and Defendant Western Wireless Corporation ("Western").

## BACKGROUND

On February 8, 1996, Congress passed the Telecommunications Act of 1996 (the

"Act") to promote competition and reduce regulation in the local telephone market. As part of the Act, existing telephone service providers like U.S. West, referred to as "incumbent local exchange carriers," "incumbent LECs," or "ILECs," are obligated to interconnect with new entrants into the telecommunications market, including wireless or mobile carriers like Western, referred to as "Commercial Mobile Radio Service Providers" or "CMRS providers." Towards that end, the Act obligates ILECs to enter into "reciprocal compensation arrangements" with entrants pursuant to which each carrier compensates the other for local telephone traffic that is transported and terminated on the other carrier's network. *47 U.S.C. § 251(b)(5)*. Prior to the Act, incumbent LECs were not legally required to compensate other carriers for such usage, but other carriers were required to compensate incumbent LECs.

When an entrant asks an incumbent to provide interconnection, the Act obligates both parties to negotiate in good faith to accomplish the requirements of the Act. *Id. at §§ 251(c)(1), 252(a)(1)*. The Act provides further that any entrant with a preexisting agreement with an incumbent may request re-negotiation of the agreement to conform it with the Act. To the extent issues remain unresolved, either party may request arbitration by the state public utilities commission. *Id. at § 252(b)*. The final agreement between the incumbent and the entrant, whether arrived at through negotiation or arbitration, must be approved by the state commission. *Id. at § 252(e)(1)*. Either party may seek review in federal district court. *Id. at § 252(e)(6)*. If the state commission fails to act within the timetables provided in the Act, the Federal Communications Commission ("FCC") assumes the state commission's responsibilities. *Id. at § 252(e)(5)*.

Prior to the passage of the Act, U.S. West and Western had entered into an interconnection agreement that provided a rate for Western's use of U.S. West's lines and services. On March 29, 1996. Western petitioned U.S. West to renegotiate their agreement to conform with the Act. Negotiations ensued, and, on September 6, 1996, the open issues were submitted to the Utah State Public Service Commission (the "Commission") for arbitration. On January 2, 1997, the Commission ruled that Western was entitled to receive reciprocal compensation retroactively beginning March 29, 1996, the date Western requested renegotiation. The Commission also found that Western's mobile switching center ("MSC") should be treated as equivalent to U.S. West's tandem switch system for the purpose of setting the rate of reciprocal compensation U.S. West must pay Western.

US West then filed this lawsuit, challenging the Commission's finding on those two points, namely: (1) the effective date from which Western is entitled to interim reciprocal compensation and (2) the interconnection rate Western is entitled to receive for the transportation and termination on its system of calls originated on U.S. West's system, the "going forward rate." [1]

## STANDARD OF REVIEW

■ The parties agree that questions of law, such as whether a state commission procedurally and substantively complied with the Act, are to be reviewed de novo, in accordance with the standard of review enunciated in *U S West Communications, Inc. v. Hix*, 986 F.Supp. 13, 18 (D.Colo. 1997). US West and Western disagree as

---

1. Initially, U.S. West also asserted that an unconstitutional taking had occurred. During oral argument of the motions, counsel for U.S. West stated that U.S. West no longer asserts a Fifth Amendment takings claim as an independent cause of action.

to the standard of review to be applied to other questions, particularly questions involving a state commission's interpretation of the Act.

█ US West argues that the state commissions are not entitled to deference as are federal agencies pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (according deference to federal agency's statutory interpretation when Congressional intent is not clear from statute's express language). US West urges this Court to follow *Hix* in this regard. The *Hix* court concluded that state commissions do not function analogously to federal agencies under the Act because they are not subject to continuous Congressional oversight and do not have "extensive experience or expertise in the specific mandate of the Act—promoting competition in the local exchange market." *Hix,* 986 F.Supp. at 17–18. The *Hix* court also noted that affording deference to the state commissions would be antithetical to the coherent and uniform construction of the Act. *Id.* at 17.

Western argues that *Hix* has been superceded in this regard. Western's argument is based on a footnote in *AT & T Corp. v. Iowa Utilities Board,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), in which the Supreme Court noted that the Act's delegation of federal policymaking to state administrative agencies created a unique scheme and left open many attendant issues. The Supreme Court said, "Such a scheme is decidedly novel, and the attendant legal questions, such as whether federal courts must defer to state agency interpretations of federal law are novel as well." *Id.* at 733 n. 10.

This Court recognizes that the Supreme Court did not substantively address the issue of the amount of deference district courts are to afford the state commissions. But, in acknowledging the uniqueness of the Act's scheme, the Supreme Court left open the possibility that application of a deferential standard could be warranted. Two considerations persuade this Court to do so, notwithstanding the distinctions between the state commissions and federal agencies drawn in *Hix.*

First is the fact that Congress specifically charged the state commissions with interpreting and carrying out the Act in the first instance. At the very least, this suggests that Congress viewed the state commissions as having relevant expertise. Second is the fact that if the FCC were to act for a state commission that did not accept its responsibilities under the Act, a reviewing court would give deference to the FCC, as a federal agency, under *Chevron.* Application of a deferential standard to the state commission's interpretations of the Act avoids this anomaly.

### DISCUSSION

**A. Did the Commission lawfully set the effective date from which Western is entitled to interim reciprocal compensation as March 26, 1996?**

█ US West challenges the Commission's application of one of the administrative rules issued by the FCC to implement the Act. The rules were released on August 8, 1996, but were not effective until November 1, 1996. *See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* 11 F.C.C.R. 15499 (1996) ("First Report and Order"). Section 51.717, commonly known as the interim reciprocal compensation rule, provides that, as of the date a competing carrier petitions an incumbent LEC to negotiate a new agreement until the time that an interconnection agreement is approved by the state, the competing carrier may charge the incumbent LEC the same rates for termination of telecommunications traffic that the incumbent LEC

charges the competing carrier. *47 C.F.R. § 51.717(b) (1998).*[2]

US West argues that the Commission improperly interpreted and applied § 51.717 to require U.S. West to provide reciprocal compensation to Western retroactively to a date that predates the effective date of the rule, namely, March 29, 1996, the date Western petitioned U.S. West to renegotiate the existing agreement.

US West argues that on March 29, 1996, there was no obligation to provide reciprocal compensation to a CMRS provider until after an agreement was approved by a state commission, citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), in which the Supreme Court held that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Id.* at 207, 109 S.Ct. 468.

US West points out that the statutory provisions authorizing the FCC to make implementing rules do not authorize retroactive rulemaking and that the FCC indicated in the *First Report and Order* that the obligation to provide reciprocal compensation was to attach "as of the effective date of the rules we adopt pursuant to this order." ¶ *1094.* As further support for its position. US West argues that retroactive application of § 51.717 is precluded by the language used in the provision itself, which states that a CMRS provider shall be entitled to interim reciprocal compensation from the date a request is made "under paragraph (a) of this section."

Western argues that the effective date of § 51.717 is irrelevant inasmuch as the express language of the Act gives CMRS providers the right to interim reciprocal compensation. Western argues that § 251(b)(5), which was effective on the date on which the Act was signed into law, February 8, 1996, provides that each local exchange carrier has the duty "to establish reciprocal compensation arrangements for the transport and termination of telecommunications." According to Western, § 51.717 merely specifies a date from which each CMRS provider may receive interim reciprocal compensation, a term that does not appear in the Act itself.

Since the Act itself requires reciprocal compensation, the question of when, after the passage of the Act, an incumbent LEC's duty to provide reciprocal compensation begins does not present a question concerning the Commission's compliance with the Act. Thus, this Court applies a deferential standard of review to the Commission's interpretation of § 51.717. The Commission's interpretation meets this standard. This is the conclusion reached by three other district courts that have considered the issue—New Mexico, North Dakota, and Montana.[3]

---

**2.** In its entirety, 47 C.F.R. § 51.717 provides:

(a) Any CMRS provider that operates under an arrangement with an LEC that was established before August 8, 1996, and that provides for non-reciprocal compensation for transport and termination of local telecommunications traffic is entitled to renegotiate these arrangements with no termination liability or other contract penalties. (b) From the date that a CMRS provider makes a request under paragraph (a) of this section until a new arrangement has been either arbitrated or negotiated and has been approved by a state PCS, the CMRS provider shall be entitled to assess upon the incumbent LEC the same rates for the transport and termination of local telecommunications traffic that the LEC assesses upon the CMRS provider pursuant to the pre-existing arrangement.

**3.** *U.S. West Communications, Inc. v. Reinbold,* No. A1–97–025, 1999 WL 1129069 (D.N.D. May 14, 1999); *US West Communications, Inc. v. Serna,* Civ. No. 97–124 JP/JHG (D.N.M. Aug. 25, 1999); *US West Communications, Inc. v. Anderson,* CV 97–9–H–CCL (D.Mont. Sept. 14, 1999).

**B. Did the Commission act lawfully in requiring U.S. West to compensate Western for the services Western provides to U.S. West at the same rate that Western compensates U.S. West?**

As explained above, the Act requires interconnecting carriers to establish reciprocal compensation arrangements for the transport and termination of traffic on each others' networks. *47 U.S.C. § 251(b)(5).* The parties do not dispute that the tandem switches utilized by U.S. West are different from the MSC switches utilized by Western, and more expensive to operate.

Tandem switches are routing switches and never operate alone. In simplified terms, a tandem switch is used to interconnect "end offices" in a common geographic area. An end office switch generally connects calls from one caller to another within a smaller geographic area. So, any call delivered to U.S. West's tandem switch must pass through both a tandem switch and an end office switch before reaching its destination.

Western always delivers calls originating on its system and destined for an end user on U.S. West's system to U.S. West's tandem switch. Thus, U.S. West always incurs two switching costs to deliver a call originating on Western's system. In contrast, Western's MSCs only have one switch. So, when a U.S. West customer calls a Western customer's cellular phone, Western incurs only one switching cost.

▮ The Commission adopted a requirement that U.S. West compensate Western for the services Western provides to U.S. West at the same rate that Western compensates U.S. West for the use of U.S. West's tandem switches. The Commission did so after concluding that Western's switches perform comparable functions and serve a larger geographic area.

US West's attack begins with the proposition that § 252(d)(2)(A) requires state commissions to arrive at a reasonable approximation of the costs of each carrier associated with the transport and termination on each carrier's facilities of calls originating on the other carrier's network. US West then argues that the fact that Western's system serves a geographic area that is at least as large as the geographic area served by U.S. West is an insufficient basis upon which to sustain the Commission's ruling and that the required functional similarity analysis performed by the Commission was arbitrary and capricious.

At least one court has agreed with U.S. West that a geographic analysis alone is an insufficient basis upon which to uphold a rate determination and that "the rate for a wireless switch should be determined by whether it functions like a tandem switch, and geography should be considered." *US West Communications, Inc. v. Washington Utils. and Transp. Comm'n,* No. C97–5686BJR, slip op. at 6 (W.D.Wash. Sept. 3, 1998). This Court also agrees.

US West argues that the functional similarity analysis performed by the Commission was arbitrary and capricious because the Commission compared Western's MSCs, on the one hand, with U.S. West's tandem switches and U.S. West's end operating switches, as they operate together, on the other hand, in violation of the *First Report and Order,* which, U.S. West argues, instructed the Commission to compare Western's MSCs with U.S. West's tandem switches standing alone. The *First Report and Order* provides:

> We find that the "additional costs" incurred by a LEC when transporting and terminating a call that originated on a competing carrier's network are likely to vary depending on whether tandem switching is involved. We, therefore, conclude that states may establish transport and termination rates in the arbi-

tration process that vary according to whether the traffic is routed through a tandem switch or directly to the end-office switch. In such event, **states shall also consider whether new technologies** (e.g., fiber ring or wireless networks) **perform functions similar to those performed by an incumbent LEC's tandem switch** and thus, whether some or all calls terminating on the new entrant's network should be priced the same as the sum of transport and termination via the incumbent LEC's tandem switch. Where the interconnecting carrier's switch serves a geographic area comparable to that served by the incumbent LEC's tandem switch, the appropriate proxy for the interconnecting carrier's additional costs is the LEC tandem interconnection rate.

¶ *1090* (emphasis added). US West asks this Court to remand the matter to the Commission to require the Commission to determine whether Western's MSCs perform the same function as U.S. West's tandem switches alone.

In the view of this Court, U.S. West approaches the matter too myopically. The *First Report and Order* directs "states to establish presumptive symmetrical rates based on the incumbent LEC's costs for transport and termination of traffic when arbitrating disputes under section 252(d)(2)." ¶ *1089*. A forward-looking cost study is necessary only when an entrant wants to rebut that presumption by establishing that its costs are greater than the incumbents. *Id.*

In light of these principles, U.S. West has not shown that there is insufficient evidence upon which the Commission could base its conclusion that Western's costs approximate U.S. West's. Nor is this Court convinced that the only permissible interpretation of ¶ 1090 is the one advanced by U.S. West, namely, that in performing a functional similarity analysis

state commissions are limited to considering only the first layer of an ILEC's system.

## CONCLUSION

For the reasons set forth herein, Western's motion for summary judgment is HEREBY GRANTED. US West's motion for summary judgment is HEREBY DENIED. The matter is dismissed; the parties are to bear their own costs.