**MICHIGAN BELL TELEPHONE COMPANY, d/b/a Ameritech Michigan, Plaintiff,**

v.

**CLIMAX TELEPHONE COMPANY, et al., Defendants.**

**No. 5:97–CV–197.**

United States District Court, W.D. Michigan, Southern Division.

Oct. 12, 2000.

---

Joseph A. Fink, John M. Dempsey, Dickinson Wright, PLLC, Lansing, MI, for Michigan Bell Telephone Company dba Ameritech Michigan, Inc., pltfs.

Gary L. Field, Harvey J. Messing, Loomis, Ewert, Parsley, Davis, et al., Lansing, MI, David A. Voges, Sharon L. Feld-

man, Jennifer M. Granholm, Attorney General, Public Service Division, Lansing, for Climax Telephone Company, John G. Strand, John C. Shea, David A. Svanda, Commissioners of the Michigan Public Service Commission (In Their Official Capacities and not as Individuals), defts.

## OPINION

QUIST, District Judge.

Plaintiff, Michigan Bell Telephone Company, d/b/a Ameritech Michigan ("Ameritech"), filed this action pursuant to § 252(e)(6)of the Telecommunications Act of 1996 (the "FTA"), Pub.L. No. 104–104, 110 Stat. 56 (1996)(codified as amended in scattered sections of 47 U.S.C.), seeking review of an interconnection agreement (the "Agreement") between Ameritech and Defendant Climax Telephone Company ("Climax") that was arbitrated and approved by the Michigan Public Service Commission (the "MPSC") under §§ 251 and 252 of the FTA. Ameritech sues Climax and MPSC Commissioners John G. Strand, John C. Shea, and David A. Svanda (the "Commissioners"). In Count I of its Amended Complaint, Ameritech alleges that the Agreement violates the FTA by permitting Climax to pay only local call rates for termination of calls that are classified under Ameritech's tariffs as "toll" calls subject to higher toll call rates. In Count II, Ameritech alleges that the MPSC exceeded its authority under the FTA by requiring Ameritech to provide intraLATA toll service to Climax customers. Finally, in Count III, Ameritech alleges that the MPSC's decision to require Ameritech to provide interLATA toll service to Climax's customers violated § 306 of the Michigan Telecommunications Act, M.C.L. §§ 484 .2101 to .2604 ("MTA"). Now before the Court are the parties' motions for summary judgment.[1]

1. In a previous Order issued February 13, 1998, the Court denied the Commissioners' motion to dismiss on the basis of Eleventh Amendment immunity. This Court rejected the Commissioner's argument, joining numerous other district courts in holding that state public service commission officials are proper

## I. Overview and Facts

### A. Telecommunications Act of 1996

Congress enacted the FTA in 1996 "[t]o promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub.L. No. 104–104, 110 Stat. 56 (1996). In particular, the FTA is aimed at introducing competition into local telephone markets, which were traditionally state-sanctioned monopolies. See A T & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371–72, 119 S.Ct. 721, 726, 142 L.Ed.2d 835 (1999). In order to encourage competition, the FTA allows startup local exchange carriers ("LEC") to interconnect to an incumbent local exchange carrier's ("ILEC") "existing local networks, to lease elements of existing local networks at reasonable rates, and to purchase the incumbents' services at wholesale rates and resell those services to retail customers." MCI Telecomm. Corp. v. Illinois Bell Tel. Co., 222 F.3d 323, 328 (7th Cir.2000)(citing 47 U.S.C. § 251).

The FTA provides a process to facilitate interconnection between ILECs and new market entrants. First, ILECs and requesting telecommunications carriers must negotiate in good faith regarding the terms and conditions of interconnection agreements. See 47 U.S.C. § 251(c)(1). Among other things, both parties must establish reciprocal compensation arrangements for the transport and termination of telecommunications. See 47 U.S.C. § 251(b)(5). The ILEC is required to provide interconnection "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and

defendants in a case such as this under the doctrine of Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The Commissioners appealed the Court's ruling, and the Sixth Circuit affirmed. See Michigan Bell Tel. Co. v. Climax Tel. Co., 202 F.3d 862, 867–68 (6th Cir.2000).

the requirements of" sections 251 and 252. 47 U.S.C. § 251(c)(2)(D). If the parties are unable to resolve their differences, either party may petition the state regulatory commission to arbitrate any open issue. *See* 47 U.S.C. § 252(b)(1). The party seeking arbitration must identify the unresolved issues and the positions of the parties with respect to those issues. *See* 47 U.S.C. § 252(b)(2). The non-petitioning party may respond to the petition and submit additional information within 25 days after the state commission receives the petition. *See* 47 U.S.C. § 252(b)(3). In conducting the arbitration, the state commission must limit its consideration of issues to those identified in the petition and the response, although it may require either party to submit additional information relative to the unresolved issues. *See* 47 U.S.C. § 252(b)(4). The arbitration panel must ensure that its resolution of the issues and any conditions imposed meet the requirements of § 251 and the regulations adopted by the Federal Communications Commission ("FCC") to implement § 251 and that the rates for interconnection, services, or network elements are in accordance with § 252(d). *See* 47 U.S.C. § 252(c). With respect to charges for transport and termination of traffic, a state commission may consider the rate of reciprocal compensation just and reasonable only if:

    (i) such terms and conditions provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier; and

    (ii) such terms and conditions determine such costs on the basis of a reasonable approximation of the additional costs of terminating such calls.

47 U.S.C. § 252(d)(2)(A).

All interconnection agreements, whether reached through negotiation or arbitration, must be submitted to the state commission for approval. *See* 47 U.S.C. § 252(e). A state commission may reject a negotiated agreement only if it discriminates against a non-party to the agreement or if it is inconsistent with the public interest or necessity; an arbitrated agreement may be rejected only if it does not meet the requirements of § 251 and its implementing regulations or if it fails to meet the pricing standards set forth in § 252(d). *See* 47 U.S.C. § 252(e)(2). Any party aggrieved by a state commission's determination may bring an action in federal court to determine whether the agreement meets the requirements of §§ 251 and 252. *See* 47 U.S.C. § 252(e)(6). State courts are expressly deprived of jurisdiction to review interconnection agreements. *See* 47 U.S.C. § 252(e)(4).

## B. Facts

Climax has been a provider of local telephone service in the Climax, Michigan area since 1911. In 1996, Climax petitioned the MPSC pursuant to § 303 of the MTA to service an additional geographic area, designated the "Metro exchange," which combined into one local calling area Ameritech's Battle Creek, Kalamazoo, Scott, and Galesburg exchanges. On October 7, 1996, the MPSC granted Climax the authority to create the new exchange. As a result of the expanded local area, Climax customers who subscribed to Climax's Metro service could place a call within the area covered by the Metro exchange without paying toll charges, regardless of whether the person called was a Climax customer or an Ameritech customer. In contrast, an Ameritech customer placing a call to either a Climax or another Ameritech customer in a different Ameritech local calling area, e.g., a call between Ameritech's Battle Creek and Galesburg exchanges, would pay toll charges for that call. Thus, a call by an Ameritech customer in Kalamazoo to a Climax customer in Battle Creek would be a toll call, whereas a call by the Climax customer in Battle Creek to the Ameritech customer in Kalamazoo would be a local call and, therefore, less expensive than the Ameritech call.

When a call is placed by a customer of one telecommunications carrier to a customer of another telecommunications carrier, the telecommunications carrier that "terminates" or completes the call to its customer is entitled to a charge for its services. *See Iowa Utils. Bd. v. FCC*, 120 F.3d 753, 792 n. 7 (8th Cir.1997), *aff'd in part, rev'd in part sub nom., A T & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). For example, in this case, a call placed by a Climax Metro exchange customer to an Ameritech customer travels over Climax's facilities to Ameritech's central office, which then routes the call over the loop connecting the central office to the Ameritech customer's phone. For local calls, Ameritech is entitled to a call termination charge of 1.5¢ per minute. However, Ameritech's termination rate is 2.299¢ per minute if the call is a toll call.

On October 1, 1996, Climax Telephone Company ("Climax") made a request to Ameritech to negotiate the terms of an interconnection agreement and related services. Climax and Ameritech engaged in extensive discussions regarding the terms, prices, and conditions of the interconnection agreement, but at some point reached an impasse on certain issues. On March 10, 1997, Climax filed a petition for arbitration with the MPSC. The MPSC appointed an arbitration panel and the parties made oral presentations to the panel on May 1, 1997. The panel issued its decision on May 21, 1997, in which it decided that:

> Climax should not be obligated to pay toll access termination charges to Ameritech Michigan when (i) the calls originate in Climax's Metro Exchange and terminate within Climax's Metro Exchange as licensed by the Commission; (ii) the calls are not routed over any Ameritech Michigan toll facilities or through any Ameritech toll tandems; (iii) the calls are routed exclusively over facilities provided by Climax; and (iv)

the calls are classified as local under Climax's tariff.

(Decision Of The Arbitration Panel at 4–5, Pl.'s Ex. F.) Thus, the arbitration panel concluded that Ameritech is only entitled to receive local call termination charges for calls placed by Climax customers within the Metro exchange to Ameritech customers when the calls travel between Ameritech exchanges. In addition, the panel concluded that "Ameritech Michigan should be required to offer intraLATA service to Metro Exchange customers." [2] (*Id.* at 11.) Ameritech filed objections to the arbitrators' decision. On June 25, 1997, the MPSC issued an order adopting the Agreement as approved by the arbitration panel and ordering the parties to submit a signed interconnection agreement. On July 11, 1997, the parties submitted the signed Agreement. Ameritech filed a petition for rehearing and reconsideration on July 25, 1997, which the MPSC denied on August 13, 1997. (*See* 8/13/97 Opinion and Order, Pl.'s Ex. A.)

## II. *Standard of Review*

■ The parties agree that this Court's review of factual determinations by the MPSC is subject to the highly deferential arbitrary and capricious standard of review. In applying this standard, "a court must consider whether the decision was based on the relevant factors and whether there was a clear error of judgment." *MCI Telecomm, Corp. v. Michigan Bell Tel. Co.*, 79 F.Supp.2d 768, 773 (E.D.Mich.1999)(citing *U.S. West Communications, Inc. v. Hix*, 986 F.Supp. 13, 18 (D.Colo.1997)). However, the parties differ on the standard applicable to the MPSC's interpretation of the FTA. Ameritech contends that the MPSC's interpretation of the FTA is subject to *de novo* review, while Climax and the Commissioners contend that the Court should apply the arbitrary and capricious standard. Although the Sixth Circuit has not addressed the issue, the Fourth, Fifth, and Ninth

---

**2.** LATA is the acronym for "local access and transport area."

Circuits and several district courts have applied a *de novo* standard of review in determining whether a state commission properly applied the FTA. *See GTE South, Inc. v. Morrison,* 199 F.3d 733, 745 (4th Cir.1999); *Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 208 F.3d 475, 482 (5th Cir.2000); *US West Communications v. MFS Intelenet, Inc.,* 193 F.3d 1112, 1117 (9th Cir.1999); *MCI Telecomm. Corp.,* 79 F.Supp.2d at 773; *US West Communications, Inc. v. Jennings,* 46 F.Supp.2d 1004, 1008–09 (D.Ariz.1999). These courts follow the well-established rule that courts should review a state agency's interpretation of a federal statute *de novo. See, e.g., U.S. West Communications, Inc. v. MFS Intelenet, Inc.,* 193 F.3d at 1117. Climax cites *US West v. Public Service Commission,* 75 F.Supp.2d 1284 (D.Utah 1999), in which the court concluded that a deferential standard should be applied. The court cited the fact that in acknowledging the uniqueness of the FTA in *A T & T Corp.,* the Supreme Court left open the possibility that a deferential standard may apply. The court reasoned:

> First is the fact that Congress specifically charged the state commissions with interpreting and carrying out the Act in the first instance. At the very least, this suggests that Congress viewed the state commissions as having relevant expertise. Second is the fact that if the FCC were to act for a state commission that did not accept its responsibilities under the Act, a reviewing court would give deference to the FCC, as a federal agency, under *Chevron[, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)]. Application of a deferential

standard to the state commission's interpretations of the Act avoids this anomaly.

*Id.* at 1287. Although this reasoning has merit, this Court agrees with the court's reasoning in *Hix* that federal courts should not defer to state agencies' interpretations of the FTA because: (1) although state agencies are responsible for interpreting the FTA in the first instance, there is no congressional oversight of those agencies under the FTA; and (2) while state agencies have experience in regulating local exchange providers, they "have little or no expertise in implementing federal laws and policies and do not have the nationwide perspective characteristic of a federal agency." *Hix,* 986 F.Supp. at 17. Furthermore, application of the *de novo* standard will facilitate development of a consistent body of law interpreting the FTA, whereas deference to interpretations by numerous state agencies is likely to lead to varied and inconsistent applications of the law.[3]

## III. *Discussion*

A. Count I—Local Call Termination Rate

■ Ameritech contends in Count I of its Amended Complaint that the MPSC's decision to allow Ameritech to recover only the local call termination rate for terminating calls placed by Climax customers within the Metro exchange to Ameritech customers within the Metro exchange violates the FTA because the duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications traffic in § 252(b)(5) only applies to local calls and not to intrastate interexchange toll calls.[4] *See* 47 C.F.R.

---

**3.** The Commissioners argue that the Agreement could not be inconsistent with the FTA because paragraph 2.2 provides that the FTA shall control in the event of a conflict between the FTA and the Agreement. The Court rejects the argument because paragraph 2.2 is not self-effectuating,. In other words that provision provides a rule for interpretation of the Agreement. The question before this Court is whether such a conflict actually exists.

**4.** For purposes of clarity, the Court notes that the calls at issue in this case are calls made by Climax Metro exchange customers to Ameritech customers between Ameritech's Kalamazoo and Battle Creek exchanges; Ameritech's Galesburg and Battle Creek exchanges; Ameritech's Scott and Battle Creek exchanges; and Ameritech's Galesburg and Scott exchanges.

§ 51.701(b). As support for this position, Ameritech points out that because a call from an Ameritech customer to a Climax customer in a different Ameritech exchange is an intrastate interexchange toll call, Ameritech is entitled to receive termination charges at the toll call rate when the same call is made by the Climax customer to the Ameritech customer. In other words, Ameritech argues that the MPSC's decision permits Climax to charge Ameritech the higher toll termination rate for calls placed by an Ameritech customer to a Climax customer in a different Ameritech exchange but only allows Ameritech to charge Climax the local termination rate if the call is placed by a Climax Metro exchange customer to an Ameritech customer. Thus, Ameritech argues, the MPSC's decision must be reversed because it fails to treat a call from a Climax customer to an Ameritech customer the same as a call from an Ameritech customer to a Climax customer.

Ameritech's argument must be rejected because its reasoning is faulty. The calls in question in this case are calls by Climax customers which originate within one of Ameritech's exchanges to an Ameritech customer in a different Ameritech exchange. The MPSC has appropriately determined that calls made by Climax customers within Climax's single Metro exchange are local calls.[5] Thus, a call by a Climax customer to any Ameritech customer within the Metro exchange is a local call subject to local call termination rates. On the other hand, because Ameritech has chosen to maintain four different exchanges within the geographic area covered by Climax's Metro exchange, a call by an Ameritech customer to any other person, whether an Ameritech or Climax customer, in a different Ameritech exchange is a toll call. Comparing a call made by a Climax customer to an Ameritech customer (local call) to a call made by an Ameritech customer to a Climax customer (toll call) is like comparing ap-

ples and oranges because the local calling areas are not the same.

Ameritech argues, however, that the MPSC's determination that all calls by Climax customers within the Metro exchange are local calls is contrary to the MPSC's historical practice, in violation of the FTA. Ameritech cites the First Report and Order issued in *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15,499, 1996 WL 452885 (1996), as support for its argument that the MPSC was required to define Climax's local calling area in accordance with the MPSC's past practice, i.e., consistent with Ameritech's defined local calling areas. The pertinent part of the First Report and Order, ¶ 1035, states in part:

> With the exception of traffic to or from a CMRS network, state commissions have the authority to determine what geographic areas should be considered "local areas" for the purpose of applying reciprocal compensation obligations under section 251(b)(5), consistent with the state commissions' historical practice of defining local service areas for wireline LEC's. Traffic originating or terminating outside of the applicable local area would be subject to interstate and intrastate access charges. We expect the states to determine whether intrastate transport and termination of traffic between competing LEC's, where a portion of their local service areas are not the same, should be governed by section 251(b)(5)'s reciprocal compensation obligations or whether intrastate access charges should apply to the portions of their local service areas that are different. . . .

*Id.* ¶ 1035. Ameritech asserts that the FCC's reference to "state commissions' historical practice of defining local service areas" essentially means that a state com-

---

**5.** Section 102(*o*) of the MTA defines "local calling area" as "a geographic area encompassing 1 or more local communities as de-

scribed in maps, tariffs, or rate schedules filed with and approved by the" MPSC. M.C.L. § 484.2102(*o*).

mission may not establish local calling areas that differ from historic exchange boundaries.

The MPSC rejected Ameritech's interpretation and instead found that the FCC's reference to historical practices simply reflected the FCC's acknowledgment that state commissions have historically determined the boundaries for local calling areas. This Court agrees with the MPSC's interpretation. The quoted language from the First Report and Order indicates that, consistent with historical practice, state commissions are to determine local calling areas. In addition, the FCC specifically recognizes that, because the FTA's goal is to increase competition in the local exchange market, there may be situations where the local calling areas of two competing LECs are not the same, as is the case here. In those cases, state commissions are to determine whether access charges (toll rates) or reciprocal compensation (local termination rates) should apply. *See id.* Thus, it is irrelevant that the MPSC has never approved the type of arrangement at issue in this case. Because local telephone markets were not open to competition prior to the enactment of the FTA, the MPSC had no occasion to consider or approve such an arrangement.

Ameritech also argues that the MPSC's decision impermissibly alters Ameritech's existing tariffs because the calls at issue by Climax customers have been treated as toll calls in the past for purpose of determining Ameritech's termination charge. Ameritech contends that the effect of the MPSC's decision is to allow "Climax to unilaterally change the rates that Ameritech is permitted to charge to terminate toll calls to Ameritech's customers pursuant to Ameritech's filed and approved access tariffs." (Pl.'s Br. Supp. at 16.) Contrary to Ameritech's assertion, the MPSC's decision does not alter Ameritech's tariffs. The MPSC has merely allowed Climax to treat Ameritech's four local exchange areas as one single area for purposes of providing a more expansive local calling area for its customers. (*See* June 25, 1997, Order at 8, Pl.'s Ex. H.)

Ameritech has cited no authority indicating that the MPSC may not allow new market entrants to define their local exchange areas in a manner that would be more favorable to its customers but less favorable to a competitor's customers, and this Court declines to establish such a rule.

Ameritech next contends that the MPSC ignored persuasive decisions from two other states that were favorable to Ameritech, *In the Matter of the Commission Investigation Relative to the Establishment of Local Exchange Competition and Other Competition Issues,* 1997 WL 120529 (Ohio PUC Case No. 95–845–TP–COI, App A, p. 27) (February 20, 1997), and *Investigation of the Appropriate Standards to Promote Effective Competition in the Local Exchange Telecommunications Market,* Wisconsin PUC Case No. 05–TI–138 (July 2, 1996). Contrary to Ameritech's argument, the record shows that the Commissioners did consider and rejected those cases as "unpersuasive on this issue for lack of demonstration that the applicable state statutes and rules are the same as those in Michigan." (*See* June 25, 1997, Order at 8.) As noted above, the FCC has determined that the states should be entrusted with the discretion to define local calling areas. Because Michigan's policies may be different from those of Ohio and Wisconsin, the MPSC did not improperly refuse to follow the Ohio and Wisconsin cases.

■ Ameritech next contends that the MPSC's decision violated the pricing standards of §§ 251 and 252 because the MPSC did not make a determination whether Ameritech's costs for terminating the calls in issue are the same as its costs for terminating other "local" calls. Climax and the Commissioners point out that Ameritech failed to raise this issue before the arbitration panel. Ameritech does not dispute this point. Where an issue has not been raised in the lower court it cannot be the subject of an appeal. *See Williams v. United Distributive Workers, Council 30 AFLCIO,* 529 F.2d 509, 510 (6th Cir. 1976)(per curiam). Here, Ameritech has

failed to demonstrate that it actually raised the issue before the MPSC. Therefore, the issue is not preserved for review by this Court. Moreover, the arbitration panel and the MPSC did consider Ameritech's costs. The arbitration panel noted that the 1.5¢ per minute termination charge exceeded the local termination rate of .3637¢ per minute Ameritech requested in another MPSC case, Case No. U–11156, as just and reasonable compensation. (*See* Panel Decision at 5, Pl.'s Ex. F.) Furthermore, in two prior cases, the MPSC determined that the 1.5¢ per minute rate for local call termination was reasonable. (*See* June 25, 1997, Order at 3.) Therefore, the arbitrators' decision was supported by substantial evidence.

Finally, Ameritech contends that the MPSC's decision violates the non-discrimination provisions of the FTA and the MTA because it allows Climax to pay a lower rate than Ameritech for the same call. However, as noted above, Ameritech's argument does not compare apples to apples because the two calls used by Ameritech to support its argument are not the same. Therefore, the MPSC's order does not treat Climax and Ameritech differently for the same call.

### B. Count II—IntraLATA Toll Service

In Count II of its Amended Complaint, Ameritech alleges that the MPSC violated the FTA by requiring Ameritech to provide intraLATA toll services to Climax customers located within the Metro exchange. Ameritech first contends that the MPSC did not have jurisdiction to consider the issue because an arbitration under § 252 is limited to ensuring that the interconnection agreement at issue meets the requirements of § 251 and all applicable FCC regulations. Ameritech argues that

neither § 251 nor any of the regulations under the FTA impose a duty upon telecommunications providers to provide intraLATA toll services to customers; thus, the provision of intraLATA toll services was not an arbitrable issue.

■ Climax and the Commissioners assert that Ameritech waived any objection that it may have to the arbitrators' jurisdiction because it did not raise the issue during the arbitration.[6] Ameritech contends that, without regard to whether it actually raised the issue, it may raise the arbitrators' jurisdiction as an issue before this Court because subject matter jurisdiction may not be waived or conferred by agreement of the parties and is an issue that may be raised at any time, including on appeal. *See United Liberty Life Ins. Co. v. Ryan,* 985 F.2d 1320, 1325 (6th Cir.1993). This argument, however, fails to appreciate the difference between an arbitrator's jurisdiction and a court's subject matter jurisdiction.

> [A] party [cannot] ever waive its right to challenge the subject matter jurisdiction of a court. In contrast, ... a party may waive its right to challenge an arbitrator's authority to decide a matter by voluntarily participating in an arbitration and failing to object on the grounds that there was no agreement to arbitrate.

*United Indus. Workers v. Government of V. I.,* 987 F.2d 162, 168 (3d Cir.1993) (citations omitted). Thus, "[i]f a party voluntarily and unreservedly submits an issue to arbitration, he cannot later argue that the arbitrator had no authority to resolve it." *Jones Dairy Farm v. Local No. P–1236, United Food & Commercial Workers Int'l Union, AFL–CIO,* 760 F.2d 173, 175 (7th Cir.1985); *see also Baer v. Terminix Int'l*

---

**6.** Climax also contends that this issue is moot because in a generic case, No. U–11525, the MPSC issued an order that Ameritech's discontinuance of intraLATA toll services to customers who switched their local service to competing local providers violates the anti-discrimination provisions of both the federal and state telecommunications laws. That

case is currently before the Michigan Court of Appeals. While the outcome in the state case may be dispositive of the intraLATA toll service issue in this case, the Court is not convinced that the decision in Case No. U–11525 will resolve all issues in the present case. Therefore, the Court finds that the issue is not moot.

*Co., Ltd. Partnership,* 975 F.Supp. 1272, 1279 (D.Kan.1997)("a party does not preserve its objection to the arbitrability of an issue unless an objection is timely made in the arbitration proceeding"). Ameritech did not object to the intraLATA issue being considered during the arbitration proceeding, although it did raise the issue in a footnote in its petition for rehearing after the arbitration was completed and after the Agreement was submitted for approval, which stated: "Further, it is by no means clear that the issue whether Ameritech Michigan may be required to provide toll service in the Metro Exchange is even properly arbitrable in the context of a Section 252 arbitration, and thus it is unclear whether the Commission properly has jurisdiction over this issue as part of this proceeding." The Court finds such a statement insufficient, because a party must "clearly and explicitly reserve[ ] the right to object to arbitrability ...." *Agco Corp. v. Anglin,* 216 F.3d 589, 593 (7th Cir.2000). Not only was Ameritech's purported objection buried in a footnote, it is not even clear that the statement was intended to put any party on notice that Ameritech was objecting to the arbitrators' authority to consider the issue. *See Amalgamated Meat Cutters & Butcher Workmen of N. Am., Local 195, AFL–CIO v. Cross Bros. Meat Packers, Inc.,* 518 F.2d 1113, 1121 (3d Cir.1975)("A party who voiced an ambiguous objection to the arbitrator's jurisdiction ... should not be permitted to reopen the arbitrator's award in the courts on the ground of the arbitrator's understandable failure to discuss the issue of the panel's composition in his award"). Moreover, the purported objection was raised too late in the proceeding to provide notice of the objection. *See Bender v. Smith Barney,* 901 F.Supp. 863, 869 (D.N.J.1994)(stating, "plaintiff raises this objection for the first time in her motion to vacate. It is not raised in plaintiff's Answer to the counterclaim, nor was it raised in any other formal manner before the arbitrators, and thus plaintiff has waived her right to object to the panel's jurisdiction over her claim"). Thus, Ameritech waived its objections to the arbitrators' jurisdiction to decide the issue.

■ Under § 251(c)(2)(D), an ILEC, such as Ameritech, is obligated to provide requesting telecommunications carriers interconnection "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory ...." Ameritech indicated that it intended to cease offering and providing intraLATA toll service to Ameritech customers who switched to Climax for local service. The arbitration panel and the MPSC found that it would be reasonable to require Ameritech to provide intraLATA toll service to Climax's customers because Ameritech provides intraLATA toll services to its own customers within the Metro exchange, and Ameritech's refusal to offer such service to Climax's customers would present a substantial roadblock to Climax's entry into the local exchange market. Given those circumstances, the arbitrators and the MPSC properly found that requiring Ameritech to provide intraLATA toll service would be just and reasonable. In addition, the arbitrators acted within their authority pursuant to § 252(e)(3), which provides that "nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement ...." 47 U.S.C. § 252(e)(3).

■ Ameritech also argues that the MPSC erred by considering certain long-term toll service contracts between Ameritech and its customers with regard to the issue of intraLATA service because Climax did not raise the issue of those contracts in its petition. However, while Climax did not specifically identify the Ameritech contracts in its petition, Climax did clearly request that Ameritech be required to continue providing intraLATA toll services to customers who switched their local service to Climax. Furthermore, the arguments regarding the Ameritech contracts were in addition to other arguments Climax made in its petition in support of requiring Ameritech to continue to provide intraLATA

toll service to Climax's customers. Under § 252(b)(4)(A), a state commission is limited to considering "the issues set forth in the petition and in the response." That section does not limit a commission in the facts that it may consider relative to the issues raised in the petition. Thus, the arbitration panel and the MPSC did not improperly consider the evidence regarding Ameritech's contracts.

Ameritech also contends that the MPSC's order that Ameritech continue to provide intraLATA toll service to Climax customers constitutes a taking of its property in violation of the Fifth and Fourteenth Amendments. Specifically, Ameritech contends that the evidence before the arbitration panel and the Commissioners conclusively established that Ameritech's cost to provide the service could very well exceed what Ameritech could charge the end user because Ameritech's standard intraLATA toll rate is 15¢ per minute, its average toll rate is even lower, and Ameritech would have to pay Climax's originating and terminating access charges, which are almost 13¢ per minute.

The Court rejects Ameritech's takings claim for several reasons. First, the rate which Ameritech sets for intraLATA toll services is set by Ameritech, not the MPSC. *See* M.C.L. § 484.2312(1). Thus, Ameritech may raise its rates accordingly. Second, under the MTA, Ameritech may apply to the MPSC for reduction of excessive access rates. *See* M.C.L. § 484.2310(2). Finally, the evidence presented to the arbitrators established that in the usual case, Ameritech would not be required to pay the 13¢ for access and termination, but rather would only be required to pay Climax either an access charge or a termination charge of 6.5¢ per minute, depending on whether the call was being placed into or out of the Metro exchange. The only instance (which would rarely occur) where Ameritech would be required to pay both the access and termination charges would be where a Metro exchange customer called a customer in an exchange served by another independent telephone company (such as Climax) which had the same access charges as Climax.

## C. Count III—Requirement For IntraLATA Toll Services Under State Law

Ameritech's final claim is that the MPSC's order requiring it to provide Climax's customers intraLATA toll service violates M.C.L. § 484.2306. Ameritech asserts that § 306 of the MTA does not require Ameritech to provide interLATA service to the Metro exchange. In addressing this claim, the Court must first consider Climax's argument that the Court does not have subject matter jurisdiction to review the MPSC's determinations under state law because the scope of review in this proceeding—whether the Agreement complies with the requirements of §§ 251 and 252 of the FTA—is very narrow. In the alternative, Climax asserts that, if the Court concludes it does have jurisdiction to review the state law issues, the Court should decline to exercise its supplemental jurisdiction because interpretation of the relevant sections of the MTA present novel and complex issues of state law.

In support of its position that the Court does not have jurisdiction over Ameritech's state law claims, Climax relies on the Seventh Circuit's reasoning in *MCI Telecommunications Corp. v. Illinois Commerce Commission*, 168 F.3d 315 (7th Cir.1999), *amended on reh'g by* 183 F.3d 558 (7th Cir.1999), *reh'g granted*, 183 F.3d 567 (7th Cir.1999), *and on reh'g*, 222 F.3d 323 (7th Cir.2000), and *Illinois Bell Telephone Co. v. Worldcom Technologies, Inc.*, 179 F.3d 566 (7th Cir.1999). In those cases, the Seventh Circuit concluded that the phrase in § 252(e)(6), "any party aggrieved by [a state commission] determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and [section 252]," considered along with §§ 252(e)(3) and (f)(2), which allow a state commission

to consider state law when approving an agreement, should be interpreted to mean that federal courts may review interconnection agreements for compliance with the requirements of §§ 251 and 252 but not for compliance with state law. *See MCI Telecomm.*, 168 F.3d at 320. In contrast, the Fifth Circuit has adopted a more expansive view of federal courts' jurisdiction under the FTA, applying a *de novo* standard in determining whether an agreement complies with the FTA and a deferential standard to all other issues, including those under state law. *See Southwestern Bell Tel.*, 208 F.3d at 481–82 (citing *US West Communications*, 193 F.3d at 1117, and *GTE South, Inc.*, 199 F.3d at 745). This Court agrees with the Fifth Circuit's reasoning that § 252(e)(6) does not preclude federal courts from considering state law issues under a more deferential standard of review. The Court reaches this conclusion because § 252(e)(4) expressly deprives state courts of jurisdiction to "review the action of the State commission in approving or rejecting an agreement under" § 252, while § 252(e)(3) expressly allows state commissions to establish and enforce other requirements of state law in reviewing an agreement. Thus, federal courts very well may provide the only forum for review of state law issues arising in relation to interconnection agreements.

The Court also rejects Climax's argument that it should decline to exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(1). Climax contends that the Court should refrain from exercising its jurisdiction because interpretation of §§ 306 and 313 of the MTA present novel and complex issues and no Michigan court has interpreted the statutes at issue. Having reviewed the sections of the MTA at issue, the Court disagrees with Climax's characterization of the difficulty of the state law issues because they are similar and closely related to the issues presented under federal law. Moreover, as mentioned above, § 252(e)(4) expressly precludes state courts from reviewing interconnection agreements, which could conceivably preclude Ameritech from re-

sorting to any other avenue for review of the Agreement.

■ The provisions of the MTA relevant to Ameritech's claim are §§ 306 and 313(1), M.C.L. §§ 484.2306, .2313(1). Section 306 provides:

Except as provided in section 312b, a telecommunication provider of basic local exchange service is not required to provide toll services. If a telecommunication provider that provides basic local exchange service does not offer toll or have interconnection with a toll provider, the commission shall order a toll provider to interconnect with the telecommunication provider upon terms that are fair to both providers.

M.C.L. § 484.2306. Section 313(1) provides:

A telecommunication provider that provides either basic local exchange or toll service, or both, may not discontinue either service to an exchange unless 1 or more alternative telecommunication providers are furnishing the same telecommunication service to the customers in the exchange.

M.C.L. § 484.2313(1).

Ameritech contends that it is not required by § 306 to provide intraLATA toll service to Climax customers and that the MPSC is prohibited from ordering Ameritech to do so where the terms of interconnection are not "fair to both providers." The Court rejects this argument because § 306 specifically authorizes the MPSC to order a toll provider such as Ameritech to provide intraLATA service to a local exchange provider such as Climax that does not provide intraLATA service to its customers so long as the terms are fair to both providers. Furthermore, the Court has already disposed of the issue of the "fairness" of the terms requiring Ameritech to provide intraLATA service to Climax customers within the context of Ameritech's claim in Count II. As noted above, the arbitrators concluded that Ameritech failed to show that it could not

provide intraLATA service without incurring a loss. Furthermore, the MPSC noted that alternatives are available to Ameritech for increasing the rates it charges for intraLATA toll service.

Ameritech also contends that the MPSC's order violated § 313(1) by not requiring another intraLATA toll provider, such as MCI or A T & T, to provide the service to Climax's customers. However, the arbitrators had good reason to require Ameritech to provide intraLATA service because Ameritech is the dominant provider in the area of the Metro exchange and allowing Ameritech to discontinue intraLATA service to its customers who switch from Ameritech to Climax for local exchange service would impede Climax's entry into the marketplace. In addition, unlike other intraLATA providers, Ameritech already had long-term commitments to provide intraLATA toll service and its facilities were already in place. Thus, the arbitrators' decision to require Ameritech to continue providing intraLATA service was not arbitrary and capricious.

### D. Climax's Counter-claim

Climax seeks summary judgment on its counter-claim, which alleges that Ameritech breached the Agreement by filing the instant action. In particular, Climax asserts that Ameritech violated § 27.1 of the Agreement, which provides:

> **27.1 Commission Approval.** The Parties understand and agree that this Agreement will be filed with the Commission and may thereafter be filed with the FCC. The Parties covenant and agree that this Agreement is satisfactory to them as an agreement under Section 251 of the Act. Each Party covenants and agrees to fully support approval of this Agreement by the Commission or the FCC under Section 252 of the Act without modification. If the Commission or the FCC rejects any portion of this Agreement, the Parties agree to meet and negotiate in good faith to arrive at a mutually acceptable modification of the rejected portion; provided that such rejected portion

shall not affect the validity of the remainder of this Agreement. The Parties acknowledge that nothing in this Agreement shall limit a Party's ability, independent of such Party's agreement to support and participate in the approval of this Agreement, to assert public policy relating to the Act.

(Agreement, § 27.1, Pl.'s Ex. I.)

Climax argues that Ameritech breached § 27.1 of the Agreement in two ways. First, Climax asserts that by alleging in its Amended Complaint that the MPSC's order violates the FTA, Ameritech breached its promise that the Agreement was satisfactory to Ameritech as an agreement under § 251 of the FTA. Second, Climax asserts that by alleging that the Agreement violates federal and state law and requesting the Court to declare that provisions of the Agreement are contrary to law, Ameritech breached its promise that it would fully support the MPSC's approval of the Agreement without modification. Ameritech responds that Climax's interpretation of § 27.1 is erroneous because the language of § 27.1 only means that Ameritech agrees that the Agreement is satisfactory as an agreement under § 251 of the FTA, not that Ameritech has agreed that all provisions of the Agreement comply with the FTA. In addition, Ameritech argues that the language requiring the parties to support approval of the Agreement by the MPSC does not limit Ameritech's right of review because Ameritech was ordered to submit a signed interconnection agreement and its actions demonstrate that it did not intend to agree that all provisions of the Agreement comply with the FTA. As further support for its contention that the parties did not intend to limit judicial review, Ameritech cites § 2.3 of the Agreement, which states:

> This Agreement is a result of an arbitration between the Parties resolved by the Commission in Case No. U–11340. Should the Commission decision in U–11340 be changed by the Commission or

by a Court, this Agreement shall be revised accordingly.

(*Id.* § 2.3.) Ameritech argues that this provision demonstrates that the parties contemplated review of the Agreement by a court and that to accept Climax's interpretation of § 27.1 would render § 2.3 invalid.

The first inquiry for a court in construing a contract is whether the contract is ambiguous or unambiguous. *See Aetna Cas. & Sur. Co. v. Dow Chem. Co.,* 28 F.Supp.2d 448, 452 (E.D.Mich.1998). Whether a contract is ambiguous is a question of law for the court to determine. *See id.* "If the language is unambiguous, the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument. However, if the [contract] is ambiguous, the question thus becomes one of determining the intention of the parties.'" *Barden Detroit Casino, L.L.C. v. City of Detroit,* 59 F.Supp.2d 641, 659 (E.D.Mich.1999)(quoting *Taggart v. United States,* 880 F.2d 867, 870 (6th Cir.1989)). The primary goal of contract interpretation is to give effect to the intentions of the parties, according to the plain and ordinary meaning of the words used in the contract. *See NBD Bancorp, Inc. v. FDIC,* 643 F.Supp. 1119, 1121 (E.D.Mich. 1986). "Accordingly, a written contract is construed according to the intentions therein expressed, when those intentions are clear from the face of the instrument." *Zurich Ins. Co. v. CCR & Co.,* 226 Mich. App. 599, 604, 576 N.W.2d 392, 395 (1997).

In order to accept Climax's interpretation of § 27.1, the Court would have to construe the language in that provision as precluding either party from asserting that the Agreement does not comply with §§ 251 or 252. In other words, the Court must conclude that § 27.1 was intended by the parties as a waiver of their statutory right of review under § 252(e)(6). However, the language does not support such an interpretation. The phrase, "The Parties covenant and agree that this Agreement is satisfactory to them as an agreement under Section 251 of the Act," indicates in unambiguous terms nothing more than Ameritech and Climax understood that the Agreement sufficed as an interconnection agreement under § 251. To accept Climax's interpretation, the Court would have to either disregard the language "as an agreement under Section 251" or read additional language into the contract stating, "The parties agree that the Agreement and procedures followed by the Commission comply with Sections 251 and 252." The Court may not do either of these things, because courts must construe contracts according to the words used by the parties in their plain and ordinary sense, and courts may not rewrite contract language for the parties. *See Equitable Life Assurance Soc'y of the United States v. Poe,* 143 F.3d 1013, 1016 (6th Cir.1998). A waiver is defined as a "voluntary and intentional relinquishment of a known right." *Moore v. First Sec. Cas. Co.,* 224 Mich. App. 370, 375,, 568 N.W.2d 841, 844 (1997). Nothing in the § 27.1 supports the conclusion that either party intended to waive their statutory right of review.

Likewise, the Court rejects Climax's assertion that Ameritech breached its agreement "to fully support approval of th[e] Agreement by the Commission or the FCC under Section 252 of the Act without modification" by challenging certain provisions of the Agreement in this case. As mentioned above, the Court would have to find that the subject language constitutes a waiver by both parties of the right to statutory review. Given the circumstances under which the Agreement was submitted to the MPSC, the requirement that Ameritech support approval of the Agreement by the MPSC without modification simply cannot be equated with an agreement to relinquish a statutory right of review. Submission of the Agreement in the form approved by the MPSC was not a matter of choice; the parties were ordered to submit the Agreement in accordance with the arbitrators' decision. In addition, in construing § 27.1, the Court must consider and give effect to all parts of the Agreement to the extent possible. *See Work-*

*mon v. Publishers Clearing House,* 118 F.3d 457, 459 (6th Cir.1997). This means that the Court must also consider whether § 2.3 of the Agreement, which contemplates the possibility of changes to the Agreement by court order, has any bearing on the parties' intentions as expressed in § 27.1. The language in § 2.3 reinforces the Court's conclusion that the parties did not intend § 27.1 to foreclose either party from seeking judicial review of the Agreement. The Agreement could be modified by court order only if one of the parties filed an action under § 252(e)(6). Neither § 27.1 nor § 2.3 of the Agreement prohibit either party from doing so.

### IV. *Conclusion*

For the foregoing reasons, the Court will deny Ameritech's motion for summary judgment and enter judgment in favor of Climax and the Commissioners on Ameritech's claims. In addition, the Court will deny Climax's motion for summary judgment and the Commissioners' motion for judgment and enter judgment for Ameritech on Climax's counter-claim.

An Order consistent with this Opinion will be entered.